# In the United States Court of Federal Claims

No. 01-642 C
(Filed: November 28, 2007)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| GASA, INC., | * | |
| | * | Motion for Summary Judgment; RCFC 56; |
| Plaintiff, | * | Dredging; Contract Interpretation; Delay |
| | * | Damages; Existence, Extent, and |
| v. | * | Reasonableness of Delay; Injury; Concurrent |
| | * | Delay; Disposal of Solid Waste; In-River |
| THE UNITED STATES, | * | Placement of Dredged Material |
| | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Eric G. Soller, Pittsburgh, Pennsylvania, for plaintiff.

David B. Stinson, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

        Presently before the court are Defendant's Motion for Summary Judgment and Defendant's Renewed Motion for Summary Judgment, both filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). In this case, plaintiff contracted with the United States Army Corps of Engineers ("Corps") to dredge certain areas of the Monongahela River. Plaintiff now seeks delay damages, compensation for the dredging and placement of certain river material, and the return of withheld liquidated damages. Because the court finds genuine issues of material fact with respect to plaintiff's delay claim, the court grants in part and denies in part defendant's motions.

## I. BACKGROUND

### A. Factual History[1]

### 1. Contract Solicitation and Award

On March 20, 2000, the Corps' Pittsburgh District issued a sealed bid solicitation for the dredging of Braddock Locks and Dam Pool 3 Navigation Channel in the Monongahela River ("the Project"). DPFUF ¶ 1. The Project consisted of dredging the river, disposal of some of the dredged material at an approved, off-site landfill, and placement of the remaining dredged material back in the river at a different location ("in-river placement"). Id. ¶ 2. The solicitation specifically identified four areas of the river to be dredged as well as the cubic yards of material associated with each area: STA 906+30 to STA 922+20 ("in-river placement area"), 71,195 cubic yards; STA 897+27 to STA 906+30 ("MU-102"), 65,455 cubic yards; STA 582+78 to STA 574+06 ("MU-59"), 27,045 cubic yards; and STA 11+46 to STA 18+66 ("MU-3"), 6,090 cubic yards. Id. ¶ 3. Only the material dredged from the in-river placement area was to be placed back in the river; the remaining material was to be disposed off-site.[2] Id. The anticipated total amount of dredged material was 169,785 cubic yards. Id. ¶ 4. The solicitation indicated that most of the contract earnings would be based on the quantity of material dredged and disposed of, except for

---

[1] The facts set forth below do not constitute findings of fact by the court. The facts are derived from the following documents, and, unless otherwise indicated, are undisputed or clearly supported by the record: Appendix to Defendant's Motion for Summary Judgment ("Def.'s App."); Defendant's Proposed Findings of Uncontroverted Fact, as continued in Defendant's Proposed Findings of Uncontroverted Fact Submitted in Conjunction With Defendant's Response to Plaintiff's Third Amended Complaint and Renewed Motion for Summary Judgment ("DPFUF"); Appendix to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, as continued in the Supplemental Appendix to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s App."); Plaintiff's Proposed Findings of Uncontroverted Fact ("PPFUF"); Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact, as continued in Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact Submitted in Conjunction With Defendant's Response to Plaintiff's Third Amended Complaint and Renewed Motion for Summary Judgment ("Pl.'s Resp."); Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact ("Def.'s Resp."); Appendix to Defendant's Reply Brief ("Def.'s Reply App."); and Appendix to Defendant's Response to Plaintiff's Third Amended Complaint and Renewed Motion for Summary Judgment ("Def.'s Supp'l App.").

[2] Prior to bid solicitation, the Corps arranged for the testing of the sediment from the river bottom. Def.'s App. 139. For testing purposes, "the river was divided into 'Management Units'. As a result of the [testing], three of these Management Units were identified which require special handling and disposal," and were therefore not candidates for in-river placement. Id. at 139-40. The three Management Units were MU-3, MU-59, and MU-102. Id. at 139.

the reimbursement for payment and performance bonds and the costs of mobilization and demobilization.  Def.'s App. 21.  The solicitation also indicated that contract performance was to begin within ten days of the Notice to Proceed ("NTP") and completed within 180 days of the NTP.  Id. at 19.

The contract was to be a continuing contract, meaning that "[t]he payment of some portion of the contract price [was] dependent upon reservations of funds from future appropriations . . . ."  Id. at 59 (containing the Continuing Contracts clause).  In the solicitation, the Corps allocated $5,200,000.00 for the contract for the current fiscal year and indicated that it "expected that Congress will make appropriations for future fiscal years from which additional funds . . . will be reserved for this contract."  Id.

Plaintiff GASA, Inc. responded to the solicitation by submitting a bid for the Project.  DPFUF ¶ 5.  The Corps opened the bids, which encompassed both basic contract items and awardable option items,[3] on April 20, 2000.  Id.  Plaintiff was the lowest qualified bidder, with a total bid of $7,668,958.45, which included a bid for the basic contract items of $6,410,559.55.[4]  Id. ¶¶ 5-6.  The Corps determined that plaintiff's bid was fair and reasonable.  PPFUF ¶ 6.

On May 25, 2000, after the Corps opened the bids but before the Corps recommended the award of the contract, R. Scott Smiley, District Engineer for the Corps' Pittsburgh District, DPFUF ¶ 47, wrote the following in an e-mail message to various Corps employees associated with the Project:

Although we have authority to proceed with the award of the dredging Pool 3 contract, the funds associated with it are not here. [The] approximate $16M or so in additional funds that HQTRS and LRD have committed to is anticipated to come in monthly dribbles, based upon (mistakenly, I believe) on expenditures.[5]

I am proposing that we [award] the Pool 3 Dredging contract with the following language in the actual award letter.  If this language passes muster with you, George, I am proposing that existing contracts be modified to deobligate only what we need thru June, and that we similarly tell each of the contractors that we

---

[3]  The option items, which were never awarded, DPFUF ¶ 10, consisted of dredging, in-river placement, and solid waste disposal of material located in the hydraulic floodway, id. ¶ 3.

[4]  Plaintiff's bid for the basic contract items included $47,721.00 for reimbursement for the payment and performance bonds and $250,000.00 for mobilization and demobilization.  Def.'s App. 21.

[5]  "LRD" refers to the Corps' Great Lakes and Ohio River Division.  PPFUF ¶ 20; Def.'s Resp. ¶ 20.

will be obligating funds for the balance of the FY on a monthly basis at the beginning of each month.[6]

Hank and Jess, by COB tomorrow I need [a] schedule, by month, of when and how much we will need for the remainde[r] of the FY. Mike, similarly, I need this on Johnstown.

Jim and Ralph, as I see it, we need to have funds obligated at least one month before the expenditure occurs, i.e., if we anticipate a contractor doing $1M in placement in July, we better have [$]1M obligated on 1 July or the RE has allowed the contractor to proceed with work for which he has not made funds available, which is, as I see it, a CFO violation.

Def.'s App. 180 (footnotes added).

Seven days later, on June 1, 2000, a contract specialist for the Corps, Michele R. Hutfles, recommended that the contract be awarded to plaintiff. Id. at 176. By letter dated June 6, 2000, Ronald Dunnington, the contracting officer, informed plaintiff that it had been awarded the contract in the amount of $6,410,559.55. Id. at 177. Enclosed with the notification letter was "a fully executed copy" of the contract and the payment and performance bonds. Id. The letter instructed plaintiff, per the terms of the contract, DPFUF ¶ 12, to "return the bonds to this office within ten days." Def.'s App. 177. Additionally, the letter indicated that, "[u]pon return to this office of the bonds, properly executed, Notice to Proceed will be issued." PPFUF ¶ 9. The contract did not contain a specific date on or by which the Corps was required to issue the NTP. DPFUF ¶ 14.

The June 6, 2000 notification letter also informed plaintiff of a contract modification, providing:

Reference is made to Page 00800-13, Paragraph 52.2320-4501, "Continuing Contracts", which states that the sum $5,200,000.00 is available for payments to the Contractor during the current fiscal year. The amount of funds available has been decreased and the amount is amended to read $100,000.00. Modification No. P00001 is enclosed reflecting this change.

Id. ¶ 11. Modification P00001 contained the following explanation of the change:

To most effectively utilize the funds available on the overall Locks and Dams 2, 3 and 4, Monongahela River project, it is necessary that funds be obligated for contract payment purposes on a monthly basis for the remainder of the fiscal year.

---

[6] The fiscal year, often abbreviated as "FY" in the record, runs from October 1 through September 30. Def.'s App. 249; Def.'s Resp. ¶ 47.

Accordingly, the amount of funds stated in the above-mentioned paragraph is decreased to $100,000.00. Additional funds will be obligated around 1 July and subsequently in early August and September consistent with what we anticipate you will earn in each of those months.

Id. At no time prior to June 6, 2000, did the Corps advise plaintiff that "funding issues" might delay the issuance of the NTP. PPFUF ¶ 11.

## 2. Events Occurring Between Contract Award and the Notice to Proceed

On June 14, 2000, plaintiff submitted its performance and payment bonds to the Corps. DPFUF ¶ 13. The Corps received the bonds on June 15, 2000, but rejected the bonds and returned them to plaintiff for correction the next day. Id. Plaintiff resubmitted the bonds on June 21, 2000, and on the following day, the Corps approved the resubmitted bonds. Id.

The Corps and plaintiff then engaged in a postaward, preconstruction conference on June 23, 2000. Id. ¶ 27. At the conference, the Corps informed plaintiff that it anticipated that the NTP would issue during the week of June 26, 2000. Id. In addition, the minutes of the conference, forwarded to plaintiff by Joseph F. Thomas, the authorized representative of the contracting officer,[7] indicate that representatives of the Corps, including Mr. Thomas, informed plaintiff that, "[i]n order for work to start, you will need an Accident Prevention Plan. This is 1 of the big 3 that needs to be submitted prior to the start of work." Def.'s App. 212, 222. The minutes also identify the Environmental Protection Plan as "the 2nd of the big 3" and the Quality Control Plan as "the final item of the big 3." Id. at 223. At the conference, plaintiff informed the Corps that it had not entered into any subcontracts nor had it chosen an offloading site.[8] DPFUF ¶ 67. However, plaintiff did indicate that it was "negotiating [with] several permitted sites" at which to dispose of the dredged material.[9] Def.'s App. 223. In addition, plaintiff requested a list

---

[7] The Corps appointed Mr. Thomas to the position of authorized representative of the contracting officer on June 6, 2000. DPFUF ¶ 25. Mr. Thomas was authorized to "take any or all actions in connection with the administration of the captioned contract" that the contracting officer was entitled to take, "exclusive of the authority to execute or agree to any contract modification . . . ." Def.'s App. 203.

[8] In fact, as late as August 18, 2000, plaintiff had not submitted an approved "Permitted Marine Facility" for river access and offloading operations. DPFUF ¶ 68. But see Pl.'s Resp. ¶ 68 (noting that the action of others prevented it from submitting such a plan). Then, on August 30, 2000, plaintiff switched water offloading sites and therefore was required to submit the permits and license information of the new facility to the Corps. DPFUF ¶ 71.

[9] The contract required that any "solid waste disposal facility" used by plaintiff be "properly permitted by the Commonwealth of Pennsylvania, Department of Environmental

of hydrographic surveyors who could perform the required predredging surveys.  DPFUF ¶ 29.
The Corps provided plaintiff with a list of surveyors in a letter dated June 27, 2000.  Id. ¶¶ 29,
60.  According to Benito Moscatiello, plaintiff's owner and president, id. ¶ 7, plaintiff began
working on the required submittals right after the preconstruction conference, id. ¶ 33.

As just alluded to, the contract required that prior to commencing dredging in a particular
area, plaintiff had to perform a hydrographic survey of that area.  Pl.'s App. 355.  Thus,
"[s]hortly after contract award," plaintiff solicited and received proposals or bids from
hydrographic survey firms to provide the required surveying services.  DPFUF ¶ 59.  In the two-
month period between contract award and the issuance of the NTP, plaintiff received at least four
proposals.  Id.

In the meantime, Ms. Hutfles drafted a memorandum concerning the Corps' issuance of
the NTP that bore the date June 16, 2000.  PPFUF ¶ 13.  Presumably, the June 16, 2000 date is
erroneous, given that the memorandum purported to address events that occurred up to and
including June 26, 2000.  Def.'s App. 210.  The memorandum provided, in its entirety:

> 1.  Subject contract was awarded on 6 June 2000[.]  Performance and
> Payment Bonds were received on 15 June 2000 and were returned to the
> Contractor for correction on 16 June 2000.  Corrected bonds were received on 21
> June 2000.
>
> 2.  Per Jeff Fritz, Project Manager, on 21 June 2000, we were to hold up
> on NTP because the House marked up the 2001 budget and there was not as much
> money in the Lower Mon[ongahela] than what was anticipated.  Per Hank
> Edwardo, Program Manager, on 22 June 2000, he was notified informally that the
> Senate might not mark up the budget until after 4 July 2000 and we may have to
> hold up NTP until after that.
>
> 3.  Per Hank Edwardo, on 26 June 2000, he requested that we issue the
> NTP.  I asked if we had funds and his response was that Les Dixon, Scott Smiley
> and h[e] met and everyone is aware of our need to continue to fund Braddock as
> well as this dredging job.  We will continue to seek money from HQ and they
> have promised that they will seek the funds to complete these jobs.  They are also
> aware of the commitment made with the state (PA) to use the dredged material for
> in-river placement on the Allegheny River.
>
> 4.  Based on the above information, NTP was issued on 26 June 2000.

_____

Protection . . . for the disposal of municipal, residual, or construction/demolition waste."  Def.'s
App. 128.

Id.  Contrary to the memorandum's representation, the Corps did not issue the NTP on June 26, 2000.  PPFUF ¶ 16.

On June 28, 2000, Henry A. Edwardo sent an e-mail message to Mr. Dunnington and Ms. Hutfles concerning the Corps' contract with plaintiff.  Pl.'s App. 49-50.  Courtesy copies of the e-mail message were sent to nine other individuals, including Michael DeStefano, the acting contracting officer,[10] and Mr. Thomas.  Id. at 49; PPFUF ¶ 18.  The e-mail message provided:

> Based on a reevaluation of the cross-LRD impacts of the House markup and passage in the House yesterday of its version of the appropriations bill, discussions with DINAMO and other insights in to the Senate appropriations picture, I have less confidence that sufficient monies will be available to sustain the District and the Braddock Dam contract next year.  I am therefore in concurrence with the opinions of Jeff Fritz, Ralph Henry and Joe Thomas that we should terminate the GASA contract.
>
> Currently, Jones/Traylor is on a course to slip significant work into FY 2001; Alan Stone (Locks 4 approach dikes) also appears on a course to do the same.  GASA would, in all probability, earn most of its $7M next year.  Without a significant plus-up by the Senate (not expected), HQ will be hard-pressed to reprogram enough money to Lower Mon[ongahela], given the hits taken by Olmsted and other nav projects in the House Bill.  All this together says, "terminate GASA" and use what limited money we can count on to pay salaries and Jones/Traylor.  While this termination is a disappointment and distasteful to me, I have lost confidence in manna from heaven.
>
> Future Pool 3 dredging work will be pursued under an IDIQ contract to better allow the district to respond to the highs and lows of the appropriations process and CG execution Corps-wide.
>
> It is therefore requested that CT terminate the subject contract.  The $100,000 obligated for this contract should be sufficient to cover the termination costs.

Pl.'s App. 49-50.  Later that day, Mr. Thomas responded, "I also support this fine decision." PPFUF ¶ 18.  The next day, Mr. DeStefano responded, "The sooner the better for all parties."  Id.

Thus, later on June 28, 2000, Mr. Dunnington, at the direction of Mr. Edwardo, orally informed plaintiff that the Corps was going to terminate the contract "due to a concern with

---

[10]  Mr. DeStefano permanently assumed the position of contracting officer on August 1, 2000.  Pl.'s App. 414.

being able to have sufficient funds next year." Id. ¶ 19.  Upon being advised of Mr. Edwardo's directive to Mr. Dunnington, the LRD directed Mr. Edwardo to reverse the telephone call to plaintiff and to delay any further action.  Id. ¶ 20.  Thus, that same day, Mr. Edwardo sent the following e-mail message to Mr. Dunnington:

> Ron, LRD asked me to "undo" the telcon to GASA; they want some more time to figure out what to do; they [questioned] if we had authority to terminate (I said CT never raised this as an issue); they also want to discuss the funding issue with HQ some more;
>
> [T]hey suggest you tell GASA that we are reevaluating the whole program and although uncertain as of now, we have not made a final decision on terminating their contract; we expect a decision on the NTP by next week;
>
> [S]orry for the flip-flop[.]

Def.'s App. 237.  Mr. Edwardo also telephoned plaintiff that day to advise that the termination orally provided by Mr. Dunnington was done at his direction and that his decision was "ill-advised, that we were reevaluati[ng] next year's funding scenario and to ignore the verbal termination."  PPFUF ¶ 21.

Around this time,[11] an unsigned e-mail message was printed by Mr. Thomas, which contained the following statement concerning the Corps' contract with plaintiff: "We do not have an NTP.  Say a[n] NTP on 5 July.  This guy is [shaky].  If he gets going, he might start to earn $$$ 15 August.  My range of earning for FY 2000 is $0 to $750K."  Pl.'s App. 53.

Another two weeks passed without the Corps issuing the NTP.  In a July 11, 2000 letter to the Corps, plaintiff wrote:

> We have submitted all documents per your letter dated June 6, 2000 and hope that everything is in order as we have not heard from anyone in the Department office to the contrary.[12]
>
> A Post Award Conference/Pre-Construction Conference was held and conducted by Mr. Joe Thomas in your field office on June 23, 2000 and

---

[11]  The e-mail message was undated.  Pl.'s App. 53.  However, the printed message contained a handwritten note by Mr. Thomas that was dated June 29, 2000.  PPFUF ¶ 27.

[12]  In addition to directing the submission of the payment and performance bonds, the June 6, 2000 letter outlined the contract's insurance requirements.  Def.'s App. 177.  Plaintiff submitted acceptable payment and performance bonds on June 21, 2000, and its certificate of insurance on June 27, 2000.  DPFUF ¶ 13.

accordingly we have been relentlessly active with the preparatory work to commence dredging.

> For example, we have secured and mobilized the necessary navigational equipment and cranes to the Project. The cranes are currently being assembled at Century Steel Erectors at Dravosburg, PA and installed on barges. Also we are preparing the required submittals to forward to Mr. Joe Thomas.

> Kindly notify us as to when we may expect your issuance of Notice to Proceed (NTP), as we wish avoiding working in the river in the month of November thus avoiding winter months.

Def.'s App. 239 (footnote added). The Corps had not indicated to plaintiff any problems with the documents submitted as of July 11, 2000. PPFUF ¶ 28.

Plaintiff followed through with the representations contained in its July 11, 2000 letter and proceeded to submit to the Corps some of the documents required by the contract. On July 11, 2000, plaintiff submitted a Quality Control Plan. Def.'s App. 278. Then, on July 12, 2000, plaintiff submitted a Propelling Unit Agreement. DPFUF ¶ 35. Plaintiff's Propelling Unit Agreement indicated that it had chartered two units "for the duration of the Project" and that "[a]ll pilots will be US Coast Guard First Class Licensed." Def.'s App. 242. Plaintiff appended the licenses of three pilots to the Propelling Unit Agreement. Id. at 243-45. Next, on July 13, 2000, the Corps received plaintiff's initial Accident Prevention Plan, DPFUF ¶ 55, and Work Plan for the Disposal of Materials, Def.'s App. 369A. Then, on July 14, 2000, plaintiff submitted its initial Operations Plan to the Corps. Def.'s Reply App. 20-21. About ten days later, on July 24, 2000, plaintiff submitted a Permitted Solid Waste Disposal Facility Agreement. Def.'s App. 373.

Another document that plaintiff submitted to the Corps during this time period was a construction progress schedule. Plaintiff submitted the schedule, in bar chart format, on July 15, 2000. DPFUF ¶ 22. The schedule indicated that plaintiff expected the NTP to be issued on July 17, 2000, that it would begin dredging on July 24, 2000, and that dredging would be completed by September 30, 2000. Id. ¶ 23. The schedule did not include any time for the submittal process because Mr. Moscatiello anticipated completing the process in June 2000, before plaintiff began work on the Project. Id. ¶ 33. The Corps commented on this for-information-only submittal on July 31, 2000, Def.'s App. 192, and noted: "Bid Items #4, 5 & 6–In accordance with [the contract,] only one 'acceptance section' is to be completed and accepted before proceeding to the next 'acceptance section'. Your schedule currently shows all of the work being performed at the same time which is not in contract compliance." Id. at 193.

On July 27, 2000, a meeting was held at plaintiff's office that was attended by Mr. Dunnington, Mr. Edwardo, and James Edinger, P.E., a Corps engineer. PPFUF ¶ 31. Mr.

Edwardo explained to plaintiff the current lack of funding for the Project. Def.'s App. 246. The Corps presented two options: (1) termination of the contract for the convenience of the government or (2) with plaintiff's permission, issuing the NTP in late fiscal year 2001, with plaintiff performing most of the work in fiscal year 2002.[13] DPFUF ¶ 36. Plaintiff suggested a third option to the Corps, proposing that the Corps issue the NTP and allow work on the Project to begin immediately if Congress made funds available for the Project. Id. ¶ 37. Mr. Moscatiello offered to seek congressional intervention and requested a week to do so. Id. The meeting concluded with the attendees' acknowledgment that obtaining the funds would be the best outcome. Id.

On July 31, 2000, plaintiff sent another letter to the Corps that stated: "As discussed today, we are incurring expenses of $500,000.00 per month awaiting the Notice to Proceed. We were assured the notice was immediately forthcoming in June. To suspend or terminate the contract at this time will cost in excess of $3,000,000.00 due to equipment leasing commitments."[14] Id. ¶ 38. Plaintiff requested that "we proceed immediately per paragraph 52.2320-4501 with payment to be made as funded with interest as provided in the paragraph."[15] Id. ¶ 41. Plaintiff also requested that the Corps issue the NTP. PPFUF ¶ 33. However, at this time, the Corps had not made a decision regarding the issuance of the NTP. Id.

Despite the Corps' indecision regarding issuing the NTP, it continued to proceed under the terms of the contract. The Corps rejected plaintiff's Propelling Unit Agreement on July 31, 2000, because (1) it did not provide that the vessels would be on site as required by the contract, DPFUF ¶ 42; (2) the Corps believed that only one of the three pilots identified by plaintiff had a first class license, Def.'s App. 241; and (3) the Corps believed that the three pilots licenses were inapplicable to the Monongahela River, id. The same date, the Corps also rejected plaintiff's Permitted Solid Waste Disposal Facility Agreement, noting that "[t]he agreement does not indicate compliance with federal, state and local laws & regulations." Id. at 373. Two days later, on August 2, 2000, the Corps rejected plaintiff's initial Accident Prevention Plan. DPFUF ¶ 55.

_____

[13] As noted above, the fiscal year runs from October 1 through September 30. Def.'s App. 249; Def.'s Resp. ¶ 47. Thus, fiscal year 2001 ran from October 1, 2000, through September 30, 2001. Def.'s App. 249; Def.'s Resp. ¶ 47. Similarly, fiscal year 2002 ran from October 1, 2001, through September 30, 2002.

[14] Mr. Moscatiello subsequently indicated that he did not remember who told him that the issuance of the NTP "was immediately forthcoming in June," but was certain that it was not Mr. Thomas. DPFUF ¶ 39. Mr. Moscatiello also indicated, after-the-fact, that the $500,000.00 figure for incurred monthly expenses was a "ballpark figure" and that the $3,000,000.00 figure for contract termination or suspension costs also was a "ballpark figure" that included "anticipated profits and expense incurred at that point" and "loss of opportunities." Id. ¶ 40.

[15] The contract provision referred to by plaintiff is the Continuing Contracts clause.

On August 3, 2000, Mr. DeStefano responded to plaintiff's July 11, 2000, and July 31, 2000 letters.[16]  PPFUF ¶ 34.  He indicated that the NTP "cannot be issued at this time due to insufficient funds."  DPFUF ¶ 43.  Mr. DeStefano also stated that plaintiff's proposal to proceed immediately with the Project was not acceptable to the Corps because it would be a violation of the Antideficiency Act.  Id.  He then indicated that the Corps had received "approval from a higher authority" to perform the Project at a later date when funds became available.  PPFUF ¶ 34.  Mr. DeStefano noted: "In awarding this contract on June 8, 2000 [sic], we had anticipated that funds would be available for this contract in fiscal years 2000 and 2001."  Id. ¶ 35.  Because funding for those years was questionable, he offered plaintiff the option of suspending the issuance of the NTP "until October 1, 2001 when it is anticipated that funds will become available."  DPFUF ¶ 43.  In conjunction with the suspension of the NTP, Mr. DeStefano offered an extension of the contract completion date until September 30, 2002.[17]  PPFUF ¶ 36.  With regard to this option: "In accordance with Contract Clause 52.242-14 Suspension of Work[,] 'an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.'"[18]  DPFUF ¶ 43.  Mr. DeStefano also offered plaintiff another option–the opportunity to request a termination of the contract–and requested that plaintiff notify the Corps if it chose this option by August 9, 2000.  Id. ¶ 44.  He concluded:

> In either case, contract modification or termination, GASA, Inc. shall be reimbursed for all proper and reasonable contract expenses incurred since contract award in preparing to receive a Notice to Proceed.  . . .  Please be advised that you should immediately cease all contract effort.  . . .  If your response is not received

---

[16]  The parties submitted two versions of Mr. DeStefano's August 3, 2000 letter–defendant's version was signed and plaintiff's version was unsigned.  The letters contain substantive differences.  See Def.'s App. 249-50; Pl.'s App. 58-59.  Despite the differences between the two versions, the parties did not dispute each other's versions of the letter.  Thus, both versions of the letter are quoted, depending on which party proposed the uncontroverted fact.  Differences are explained in footnotes.

[17]  The version of the letter submitted by defendant instead provides that "[t]he contract completion date will be determined after the Notice to Proceed has been issued."  Def.'s App. 249.

[18]  The version of the letter submitted by plaintiff does not contain this sentence.  Pl.'s App. 58.  Instead, plaintiff's submitted version provides that "[t]he government would be open to negotiate all reasonable price adjustments due to such a modification."  Id.

by COB on August 9, 2000, the contract will be terminated for the convenience of the government.[19]

Pl.'s App. 59 (footnote added).  On the same date as this letter, the Corps rejected plaintiff's Quality Control Plan, Def.'s App. 278; Operations Plan, Def.'s Reply App. 20; and Work Plan for the Disposal of Materials, Def.'s App. 369A.

Meanwhile, on August 4, 2000, the Pennsylvania Department of Environmental Protection ("DEP") wrote a letter to plaintiff in follow-up to a July 26, 2000 meeting concerning plaintiff's water management plan for the Project.  Id. at 369C-369D.  The DEP wrote: "Subsequent to our meeting, the Corps informed us that this project (the dredging of the small quantity of uncontaminated and contaminated material from Pool 3) will be delayed for one year."  Id. at 369C.  The DEP also advised plaintiff that its plan to treat and discharge wastewater contradicted the Corps' specification because the Corps' "specification did not allow for treatment and discharge of the wastewater generated during this project," and that the "issue must be resolved."  Id.

On August 7, 2000, in response to the Corps' August 3, 2000 letter, plaintiff agreed to a meeting to discuss its options.  Id. at 251.  Accordingly, plaintiff and the Corps met on August 8, 2000.  DPFUF ¶ 45.  At the meeting, Mr. Moscatiello reiterated his statement that plaintiff had incurred $3,000,000.00 in costs to date and asserted that he expected to obtain between $5,000,000.00 and $6,000,000.00 if plaintiff successfully sued the Corps.  Id.  Plaintiff then wrote a letter to the Corps on August 10, 2000, which stated:

> Thank you for setting up the Meeting on Tuesday, August 8, 2000, at your office.  I believe the discussions relative to the above captioned project were enlightening.
>
> However, I respectfully remind you, that to terminate this Contract would be catastrophic to us and not convenient for the Army Corps of Engineers, because, as we discussed, the total amount of the Contract would be [expended] in any event, only reduced by a minimal amount for labor, trucking and disposal fee

_____

[19]   Alternatively, defendant's submitted version of the letter provides:

> In either case, delaying the Notice to Proceed or termination, GASA, [I]nc. shall be reimbursed in accordance with the applicable Contract Clause.  Please be advised that you should immediately cease all work under this contract.  If your response is not received by COB on August 11, 2000, the contract will be terminated for the convenience of the government in accordance with Contract Clause 52.249-2 Alt I.

Def.'s App. 250.

of approximately 100,000 cubic yards of contaminated material to a permitted landfill.

Accordingly, to re-divert funds to perform this project would be the only just thing to do and in the best interest of all concerned.

I hope that after you reflect on this most important matter anything other than issuing a Notice to Proceed would be irresponsible.

Id. ¶ 46.

While the Corps was communicating with plaintiff, it also was engaged in internal discussions. On August 9, 2000, Mr. Smiley sent an e-mail message to other Corps personnel, which provided, in part:

As you are aware, this contract has been awarded, a pre-construction conference has been held, and the contractor has submitted his bonds. The Government has subsequently delayed the issuance of the NTP due to funding uncertainty, both in this FY and in FY01. . . .

To me, the resolution of this matter is a classic no-brainer. Rather than pay possibly $1.5M to terminate the contract and get nothing, except a long legal battle and tons of bad press for awarding a contract we had no funds for and had to ultimately terminate, I would propose that we issue the NTP. Where do we find the money[?] In earlier drills, we had [whittled] the funding needs on the Lower Mon[ongahela] project down to $6M. Yesterday, after a review by Hank, I alerted Dan Spellman that we were cutting our needs back to $3.5M, which included nothing for this contract. CD has estimated that [GASA] has the capacity to earn $1.5-$2M this FY, and the balance, [$4M], depending on whether we award the awardable option next FY. (Internally, we are having some discussion about deleting a portion of the work at some future date.)

I am proposing that Dan increase the Lower Mon[ongahela] needs list for FY00 to $5M, [] which is still less than the $9M we were at two days ago, and on this assurance, I will reallocate some funds I currently have set aside for the Braddock Dam contract to this effort and issue NTP to [GASA]. Since I realize that nobody will commit to any FY00 funds now, I would propose that we fund this work as a priority item out of the FY01 work allowance we ultimately receive. I fully believe that we are going to have insufficient funds available next year under any scenario to pay the $40M in anticipated earnings on the Braddock [D]am contract. I also fully believe that, in a $1.2B CG program, that somehow $10-15M will be identified and reprogrammed to the Lower Mon[ongahela]

project to avoid having to suspend the contract, especially after we have successfully floated the segment into place.  Talk about partnering.

Anyway, these are the facts and my recommended solution.  Comments?  Concurrence?  Dan, what['s] your vibe from Mulger?  Can he get us the $5M we need this year to make this happen[?]

Def.'s App. 256.

Despite Mr. DeStefano's assertion in his August 3, 2000 letter to plaintiff that the Corps would terminate the contract for the convenience of the government on either August 9 or August 11, 2000, the Corps did not do so.  PPFUF ¶ 38.  Instead, on August 11, 2000, Mr. DeStefano wrote a memorandum providing: "Issue NTP Monday 8/14/00 after hear results of Col[onel] Ridenour's] Note to Gen[eral] Griffin."  Pl.'s App. 67.

As referenced in Mr. DeStefano's memorandum, Colonel David R. Ridenour sent an e-mail message to Brigadier General Robert Griffin of the LRD on August 11, 2000.  DPFUF ¶ 48.  Colonel Ridenour wrote:

In an Email I forwarded to you on 28 July 2000, I stated that we proposed to delay start of our $7+ million stretch contract to dredge pool 3 on the Lower Mon[ongahela].  However, subsequent to discussion with the contractor, we have concluded that it is in the best interest of USACE to proceed with this contract.

We have involved the subject contractor in discussions on potential actions to delay or terminate the contract.  We estimate that termination or delay will have a price tag in excess of $1.5 million.  This is a significant loss on a construction contract with a base cost estimate of $6.4 million and an awardable option of $1.3 million.  In addition, I would anticipate litigation with any proposal to terminate.

Rob Vining and Les Dixon have discussed this situation and have concluded that the "smart and best" course of action is to issue a notice to proceed on this contract.  My PRB is in full concurrence with this action.  On Monday, we plan to issue an NTP and will continue to work closely with your staff with respect to pursuit of CG funds.  If additional funds cannot be found, this work will be funded directly from the Lower Mon[ongahela] Navigation Project and other contract work slowed or delayed.

PPFUF ¶ 44.

-14-

Mr. Edwardo forwarded a copy of Colonel Ridenour's August 11, 2000 e-mail message to Mr. DeStefano and Mr. Edinger on August 14, 2000, noting: "FYI, this is what Col[onel] Ridenour sent [General] Griffin on Friday; Scott advises us to wait until late this morning to gauge LRD's reaction before proceeding with the NTP."  Pl.'s App. 68.  Sometime that same day, Mr. DeStefano advised plaintiff by telephone that according to Mr. Smiley, $1.5 to $2 million would be available for the Project and the NTP would be sent to plaintiff via facsimile later that day.  PPFUF ¶ 46.

As Mr. DeStefano represented, on August 14, 2000, the Corps issued the NTP and transmitted a copy to plaintiff via facsimile.  DPFUF ¶ 49.  Thus, pursuant to the terms of the contract, the completion date for the Project was established as February 10, 2001.  Id. ¶ 83.

As of August 14, 2000, plaintiff had not completed mobilization and acquisition or rental of equipment and material for the dredging operations.  Id. ¶ 70.  In addition, plaintiff, according to its quality control manager, still was attempting to secure a hydrographic surveying firm.  Id. ¶ 61.  Plaintiff had not hired any of the firms that had submitted bids as of August 14, 2000.  Id. ¶ 59.

### 3.  Events Occurring Between the Notice to Proceed and the Commencement of Dredging Operations

As previously noted, the contract required that plaintiff begin performance within ten days after receiving the NTP.  Def.'s App. 19.  The parties exchanged letters on August 15, 2000. Plaintiff's letter to the Corps acknowledged receipt of the NTP, and provided:

> In order to further minimize delays, we have employed the services of Mr. Joseph P. Burke to expedite the submittals and resubmittals as required.
>
> We would appreciate your cooperation with Mr. Burke in the review and resubmission process to the extent that he may be involved personally, at your office, to clarify interpretations, modify submittals or otherwise be provided insight as to corrective action that may be required.
>
> Please note that the submittal register on a diskette has not yet been provided as outlined in [the contract].

Id. at 261.  The Corps' letter to plaintiff similarly addressed plaintiff's submittals.  DPFUF ¶ 51. The Corps identified ten different submittals that were either never submitted or in need of resubmission.  Id.  The list included the "big 3" submittals required prior to the commencement of dredging operations: the Environmental Protection Plan, the Quality Control Plan, and the

Accident Prevention Plan.  Id.  Also on August 15, 2000, the DEP advised the Corps of the issues surrounding plaintiff's plan to treat and dispose wastewater.[20]  Id. ¶ 75.

Plaintiff and the Corps met on August 17, 2000, and discussed plaintiff's previously-rejected Propelling Unit Agreement.  Id. ¶¶ 52-53.  That same day, plaintiff submitted another Propelling Unit Agreement.  Def.'s App. 266.  The resubmitted Propelling Unit Agreement differed from the original in two ways.  First, the resubmitted Propelling Unit Agreement added the following sentence: "Both units will be on site full time."  Id. at 267.  Second, the resubmitted Propelling Unit Agreement informed the Corps that the pilot licenses that plaintiff had previously submitted were fully compliant with the United States Coast Guard's requirements.  Id.  The Corps eventually approved plaintiff's Propelling Unit Agreement, but there is conflicting information as to which Propelling Unit Agreement the Corps approved–the original or the resubmitted agreement.  On one hand, Mr. Thomas approved the resubmitted Propelling Unit Agreement on August 24, 2000.  Id. at 266.  On the other hand, the Corps informed plaintiff, in an August 25, 2000 letter, that the original Propelling Unit Agreement, submitted on July 12, 2000, was changed from "disapproved" to "Satisfactory."  DPFUF ¶ 53; see also Pl.'s App. 564-65 (containing Mr. Thomas's subsequent statement that he intended to approve the originally submitted Propelling Unit Agreement).

On August 18, 2000, plaintiff submitted its first post-NTP Operations Plan.  DPFUF ¶ 76.  The plan anticipated the dredging of 1,100 cubic yards of material per crane per day.  Id.  The plan also reflected plaintiff's expectation that the Project would take about two months, beginning in September and ending in November.  Id.  To achieve this schedule, plaintiff requested permission in the Operations Plan to dredge simultaneously the in-river placement area and MU-102.[21]  PPFUF ¶ 59.

The Corps continued to analyze how much funding the Project would require and when the funding would be required.  Mr. Thomas, in an August 21, 2000 e-mail message to Mr. Edwardo and Ralph T. Henry,[22] wrote:

> I have reviewed the current status of the contract and find the following.  GASA has four cranes[:] two to dredge and two to empty.  The two to dredge will control productivity at a rate of say 1000 cy per day per rig.  So we have the capability to manage probably 2000 cy per day min.  The total contract is say

---

[20]  As late as August 25, 2000, plaintiff had not yet located a sewer authority to handle the decanted water from the Project.  DPFUF ¶ 69.  However, on September 27, 2000, plaintiff entered into an agreement with a water disposal facility.  Id. ¶ 73.

[21]  As noted above, plaintiff had previously proposed simultaneous dredging in its initial construction progress schedule submitted on July 15, 2000.  Def.'s App. 192-93.

[22]  At that time, Mr. Henry was a Contract Administrator.  Def.'s App. 254.

170,000 (without the options) divided by 2000 gives 85 work days of dredging. [A]t 6 days dredging per [week] and a start of 1 Sept our finish would be about 1 Dec or earlier pending no adverse weather.  This brings me to the question of money[:] what do we have and how much so we do not put ourselves in the position of this guy just going on and dredging earning money beyond our means to pay.  Up front we need about $300K for bends mob etc.  If you say we have $2Million this leaves $1.7 mill to dredge.  $1.521 does the non regulated materials dredge and place or 72,000cy or about 40 calendar days of work or completion about 5 Oct.  Thus we have nothing for the MU units.  Bottom line[:] how much money guaranteed do we have so that a schedule can be made on the project AND we do not spen[d] money I do not have[?]  Show me the money.

Pl.'s App. 98.  The message was forwarded to Mr. Smiley, id., who, in an August 23, 2000 e-mail message to Mr. Edinger, Mr. Henry, and Mr. Edwardo, responded:

Please interpret Joe Thomas's message for me.  I recently got an additional $2M on Lower Mon[ongahela] and am attempting to get another $3M by 11 Sep.  I thought we had decided that CD would tell [GASA] that we would fund him to the tune of $1.5M this FY, and that the balance would be made available out of next FY's appropriation.  If we do get the $3M, and we can accrue more on the [GASA] contract this FY, we should certainly do so.

PPFUF ¶ 57.  Mr. Edwardo forwarded Mr. Smiley's response to Mr. Thomas, who in turn wrote the following to Mr. Edwardo: "I will explain tomorrow."  Pl.'s App. 98.  Mr. Thomas's explanation, if it occurred, is not contained in the record.

Meanwhile, on August 22, 2000, plaintiff received a proposal and quotation for the required hydrographic surveying from Woolpert LLP Surveying ("Woolpert"), the fifth surveying firm to submit a proposal to plaintiff.  DPFUF ¶ 62.  Plaintiff and Woolpert subsequently reached an agreement regarding Woolpert's provision of hydrographic surveying services on August 28, 2000, id., and plaintiff submitted its Qualifications of Hydrographic Surveying Firm on August 30, 2000, Pl.'s App. 395, 397-98.

Then, on August 25, 2000, plaintiff resubmitted its Accident Prevention Plan, which the Corps rejected for the second time on August 30, 2000.  Def.'s App. 272.[23]  On August 29, 2000, plaintiff contracted to have its three barge-mounted cranes inspected, tested, and certified. DPFUF ¶ 74.  Subsequently, on September 5, 2000, the crane inspector reported to plaintiff that the crane matting was improperly installed.  Id.  The crane certificates were eventually signed on September 7-8, 2000.  Id.

---

[23]  This page of defendant's appendix contains the handwritten notes of an unidentified person.  Plaintiff does not appear to contest the information included on this page.

Two communications concerning plaintiff's submittals also occurred on August 29, 2000.
First, on that date, plaintiff submitted an Environmental Protection Plan. PPFUF ¶ 102. Thus,
between July 11, 2000, and August 29, 2000, plaintiff submitted to the Corps at least one of each
of the "big 3" submittals. Id. ¶ 100. Also on August 29, 2000, the Corps responded to plaintiff's
August 18, 2000 Operations Plan, stating that the plan was "satisfactory" but that plaintiff's
"request for a variance of the dredging procedure . . . is not approved at this time." Def.'s App.
384. The attached comment noted:

> The Operation Plan is satisfactory except as follows:
>
> We cannot allow for simultaneous dredging of clean fill and Management
> Unit (MU) No. 102. We would entertain an option of simultaneous dredging of
> the clean fill and MU No. 59 or MU No. 3 if you can demonstrate your methods
> for dredging the MU material per contract spec. Please advise us if you desire this
> alternative.

Id. at 385. Plaintiff met with the Corps to discuss simultaneous dredging on August 31, 2000,
and memorialized the meeting in a September 1, 2000 letter:

> Our schedule and bid are based on the use of four cranes to complete this project.
> If we are not allowed to work all of the large areas at the same time, we will not
> utilize our equipment efficiently. We had planned to work four cranes, two
> digging and two placing in the in-river area for one or two weeks, then move two
> cranes to the contaminated areas, and continue the in river placement with the
> other two. If we must work the MU 102 area last, two cranes would be the
> maximum we could use without blocking the channel to barge traffic. Also if we
> have to work more than two cranes in contaminated material we would not be able
> to handle the unloading at the dock facility or the waste handling area because we
> cannot stock[]pile the material. This would increase the job length and increase
> our cost.
>
> The second point we discussed was the option area adjacent to the in-river
> placement dredge area. The option areas are directly abutting the dredge area and
> there will be spillage of option fill into the area dredged for in river placement.

Pl.'s App. 106.

While the parties were discussing plaintiff's proposed simultaneous dredging, the Corps,
on August 30, 2000, rejected plaintiff's Environmental Protection Plan. PPFUF ¶ 102. In a letter
of the same date, the Corps informed plaintiff:

> Please be advised that I have tried to make the submission of the required
> Big "3", (Environmental Protection Plan, Quality Control Plan, and Accident

-18-

Prevention Plan) as easy as possible by meeting with you, furnishing examples to you, and discussing various items on the phone with you.  However, as of 30 August 2000, your Quality Control Plan is still rejected, your Environmental Protection Plan is still rejected, and your Accident Prevention Plan is rejected.

Please be advised until such time that you submit these plans that meet the contract, no dredging will be allowed to commence.

DPFUF ¶ 54.  However, the next day, the Corps approved plaintiff's Quality Control Plan, with comments, which plaintiff had submitted on August 30, 2000.  Pl.'s App. 384, 393.

The Corps tentatively approved plaintiff's Qualifications of Hydrographic Surveying Firm on September 1, 2000, with certain comments and caveats.  Id. at 395.  Specifically, the Corps indicated that plaintiff's "initial plan appears to be satisfactory" but requested that plaintiff be able to address certain issues at a preparatory survey meeting.[24]  Id. at 396.  Plaintiff's surveying firm, Woolpert, was expected to begin survey work on September 5, 2000, and the preparatory survey meeting was held that day.  DPFUF ¶ 64.  At the meeting, Tim McCarley, the Corps' survey quality control representative, reported: "[T]he equipment being used was not survey grade equipment.  We also agreed that the crew did not have the required or proper knowledge to be able to complete a hydrographic survey."  Id.  The next day, Mr. McCarley visited the Project site and noted the following: "The manual repeatedly referred to the fathometer as a 'Fish Finder.'  . . .  The method of editing the data, as described to the QA inspector, was absolutely unacceptable.  After discussing the above with the Survey Contractor, Woolpert LLP decided to remove their crew from the job."  Id.; Def.'s App. 344.  Thus, on September 7, 2000, plaintiff obtained another proposal for the surveying work from Michael Baker Jr., Inc. ("Michael Baker").  DPFUF ¶ 65.  Plaintiff hired Michael Baker and the firm began survey work on September 11, 2000.  Id.  Plaintiff subsequently submitted the Qualifications of Hydrographic Surveying Firm and the Surveying Quality Control Plan on September 19, 2000.  Pl.'s App. 404-05.  Michael Baker completed the predredging survey on September 20, 2000.  DPFUF ¶ 65.  That same day, the Corps accepted plaintiff's Qualifications of Hydrographic Surveying Firm "depending upon demonstrated ability in the field," Pl.'s App. 404, and rejected plaintiff's Surveying Quality Control Plan, id. at 405.  However, with respect to the latter submittal, the Corps indicated that government acceptance was "dependant upon demonstrated ability in the field."  Id.  Mr. Moscatiello later conceded that plaintiff, and not the Corps, was responsible for the problems surrounding the predredging survey.  Def.'s App. 475.

While proceeding with the predredging survey, plaintiff submitted another Environmental Protection Plan on September 8, 2000, id. at 277; an addendum to its Quality Control Plan responding to the Corps' comments on September 8, 2000, Pl.'s App. 399; and another Accident

---

[24]  Because the Corps referred to a "plan" and not just Woolpert's qualifications, it is unclear whether the parties considered this submittal to include a Surveying Quality Control Plan.

Prevention Plan on September 11, 2000, Def.'s App. 272.  The Corps also took action on September 11, 2000, by approving plaintiff's resubmitted Environmental Protection Plan and Accident Prevention Plan, id. at 272, 277, as well as plaintiff's addendum to its Quality Control Plan, Pl.'s App. 384, 399.  Plaintiff also submitted another Operations Plan on September 11, 2000, which reaffirmed the schedule set forth in its August 18, 2000 Operations Plan.  DPFUF ¶ 76.  Plaintiff then submitted an updated Operations Plan on September 14, 2000.  Id. ¶¶ 66, 76; Def.'s App. 352-54.  The updated Operations Plan reflected an anticipated three-month completion schedule, beginning in mid-September and ending in mid-December.  DPFUF ¶¶ 66, 76.  Plaintiff continued to plan on a dredging rate of 1,100 cubic yards of material per crane per day.  Id. ¶ 76.

Plaintiff additionally submitted its initial invoice to the Corps–Pay Estimate Number 1–on September 13, 2000, seeking payment in the amount of $197,721.00.  Def.'s Supp'l App. 2.  Plaintiff's invoice indicated that the total amount comprised of $150,000.00 for mobilization costs and $47,721.00 for payment and performance bond reimbursement.  DPFUF ¶ 126.  In support of Pay Estimate Number 1, plaintiff submitted "invoices from, or evidence of payment to," Tonomo Marine, Inc., McDonough Marine Service, and E & K Equipment, Inc.  Id. ¶ 130.  The day prior to plaintiff's payment request, the Corps, via a September 12, 2000 contract modification, had obligated an additional $1,500,000.00 to the contract.  Pl.'s App. 415.  The Corps approved and processed plaintiff's payment request on September 20, 2000.  DPFUF ¶ 126.  Then, the next day, the Corps deobligated $1,200,000.00 from the contract, leaving a total obligation of $400,000.00 for the current fiscal year.  Pl.'s App. 416.  The Corps did not obligate any additional funds to the contract until the next fiscal year.  Id. at 417.

### 4.  Events Occurring During and Immediately Following Plaintiff's Commencement of Dredging Operations

Plaintiff began dredging operations on September 21, 2000.[25]  DPFUF ¶ 65.  That day, Mr. Burke met with Mr. Thomas and discussed the disposal of solid waste from the in-river placement area.  In a September 26, 2000 letter, plaintiff stated its position on the disposal issue:

> In our preliminary meeting [on] September 21, 2000 you directed me to separate and alternately dispose of rubble, logs & timbers, tires and other rubber products, scrap metal items, railroad ties, wire, large chunks of concrete, boulders, and other non-floatable debris, from the dredged materials removed from the Monongahela River between sta. 906+30 to sta. 922+20.  You directed that we

---

[25]  It appears that plaintiff began dredging in the area identified as the in-river placement area.  See, e.g., Def.'s App. 397 (indicating that plaintiff was engaged in dredging and in-river disposal on October 2, 2000); Def.'s Supp'l App. 116 (indicating that for the period from September 1, 2000, through October 24, 2000, plaintiff requested payment for dredging of STA 906+30 to STA 922+20, and no other areas).  But see Def.'s App. 351 (indicating that plaintiff began dredging on September 21, 2000, in MU-102).

take this material to our permitted waste facility at Waste Management Inc.  The contract states that materials in this area are to be transported and disposed of as specified in paragraph "IN RIVER PLACEMENT OF DREDGED MATERIALS[.]"  We are proceeding with your directive and separating all materials.

      However the Management of GASA Inc. believes that all materials dredged from the In River Placement Section of this project should be placed back in the river and designated "Unclassified[.]"

      We will continue to perform as directed; however[,] we feel that additional compensation should be discussed[.]

Pl.'s App. 144.  The Corps responded in a September 28, 2000 letter:

In accordance with [the contract], all solid wastes recovered from the dredging operations from any area are to be extracted from the dredged material, set aside, and disposed of in a permitted solid waste disposal facility permitted to receive the particular material.  . . .

      In accordance with the contract, it is not permissible to designate all non-regulated materials dredged "unclassified" and placed back into the river.  Furthermore, no additional compensation to perform the work to be within Contract compliance will be discussed.  Follow the Contract.

Id. at 145.  Plaintiff was undeterred by the Corps' letter and, on November 16, 2000, requested reimbursement from the Corps for the disposal of this solid waste in the amount of $29,305.70.  Id. at 147.

Unfortunately for plaintiff, the Corps was not satisfied with plaintiff's contract compliance.  In a letter dated October 2, 2000, Mr. Thomas notified plaintiff of the following:

      In accordance with [the contract], and the non-regulated dredging preparatory meeting held on 21 September 2000, daily surveying Quality Control Reports are to be submitted attached to your daily Quality Control Reports.  These daily surveying QC Reports have never been received in this office.  This is to notify you that you are not in contract compliance.  Please be advised that until such time that all of the proper documentation is being submitted as agreed upon, no dredging of regulated materials will be allowed to commence.[26]

---

[26]  As noted above, the material in three of the four areas plaintiff was required to dredge–MU-3, MU-59, and MU-102–required special handling and disposal.  According to

Id. at 99 (footnote added).  In another letter of the same date, Mr. Thomas notified plaintiff of the following:

> In accordance with [the contract,] all survey results including quantity calculations, cross-sections and drawings, field notes, notebooks, Fathometer scrolls, electronic files, and all other records relating to the survey or layout of work are to be submitted.  None of this information has been submitted as of yet, approximately two weeks after the surveys have been completed.  This is to notify you that you are not in contract compliance.  Please be advised that until such time that all of the proper documentation is being submitted as agreed upon, no dredging of regulated materials will be allowed to commence.

Id. at 100.

Despite these issues, plaintiff continued to pursue simultaneous dredging.  In an October 5, 2000 letter, plaintiff addressed its sequence of work:

> Sequence of Work: To further clarify previous submittals, upon demonstration to your satisfaction of water disposal and barge unloading procedures, we intend to move two (2) of our four (4) dredge barges into M.U. 102, to start dredging operations.  The aforementioned test is scheduled for Friday, October 13, 2000, as you agreed with our Joe Burke.  Sequentially, we intend to dredge M.U. 102, M.U. 59 and M.U. 3 simultaneously with the in-river placement dredging.  This sequencing is imperative to best suit the construction schedule and avoid winter months, particularly in the view that the Notice To Proceed was issued approximately two (2) months after the Award.

Id. at 108; see also Def.'s Reply App. 36-37 (containing plaintiff's September 22, 2000 addendum to its Operations Plan, which indicates plaintiff's intent to demonstrate its "procedure for handling the water contained in the dredge material" pursuant to the contract).  Mr. Thomas reported on plaintiff's demonstration of its offloading procedures in an October 24, 2000 letter:

> In accordance with [the contract], the contractor was to demonstrate his method of collecting and controlling water from the barges prior to beginning the regulated material dredging.  The field demonstration began on Friday, October 13th and concluded on Friday, October 20th.  The demonstration was not totally successful in that various problems existed such as grounding the material barge, lack of internal dike system within new water barge, transportation problems, etc.
> . . .

---

defendant, the material in MU-3, MU-59, and MU-102 was "regulated material."  See Def.'s Resp. ¶¶ 79-80.

. . . .

In summary, dredging of the Management Unit cannot commence until you:

a.  Have a "totally" successful field demonstration of your procedures for dredging the Management Units.

b.  You have held a Preparatory Inspection after the successful field demonstration.

c.  You furnish us various contract submittals; namely, a list of certified water tight barges.

Pl.'s App. 101-02; see also id. (enumerating several other problems with the demonstration). About three weeks later, in a letter dated November 16, 2000, plaintiff expressed additional concern to Mr. Thomas regarding simultaneous dredging:

We were informed we would be permitted to simultaneously dredge in-river placement from 906 - 922 and MU areas once we demonstrated our ability to comply with the contract specification for proper containment of the materials.

We are now informed you are additionally requiring the previous dredging to be accepted as well which is not relevant to the removal of the contaminated materials.  This additional requirement will have an impact of further unnecessarily delaying the project.[27]

Unless this matter is reconsidered and we are permitted to proceed immediately, as agreed in August, we will expect to be properly compensated for the resulting delay.

Id. at 110 (footnote added).  In another letter dated November 16, 2000, plaintiff requested reimbursement for its disposal of solid waste from the in-river placement area in the amount of $29,305.70.  PPFUF ¶ 110.  The Corps did not reimburse plaintiff.  Id.

Around the same time, plaintiff submitted its second invoice to the Corps.  The Corps received Pay Estimate Number 2 on November 13, 2000.  Def.'s Supp'l App. 115.  Plaintiff's request included a certification that subcontractor Massimo Corporation ("Massimo") earned

---

[27]  The record does not appear to pinpoint the exact date when plaintiff was permitted to begin simultaneous dredging.  See, e.g., Def.'s Supp'l App. 125 (indicating that plaintiff requested payment for dredging both the in-river placement area and MU-59 for the period from November 21, 2000, through December 31, 2000).

$143,321.04 between September 1, 2000, and October 24, 2000.  Id. at 120.  The Corps paid plaintiff $344,653.64 pursuant to Pay Estimate Number 2.  Id. at 115.

Also during this time, the Corps proposed altering the method of disposing the material dredged from MU-102.  In a November 13, 2000 letter signed by Mr. Thomas, the Corps requested that plaintiff "submit a proposal for eliminating the permitted solid waste disposal for MU 102 area and replacing it with in-river placement of all quantities dredged from MU 102." PPFUF ¶ 66.  Plaintiff's proposal was to be submitted to the Corps within ten days and to conform to the contract clause titled "MODIFICATION OF PROPOSAL-PRICE BREAKDOWNS."[28]  Pl.'s App. 111-12.  In response, on November 15, 2000, plaintiff wrote to Mr. Thomas:

> The estimated cost of the NEW IN-RIVER PLACEMENT would exceed our actual cost for the disposal of the material removed from Sta. 897+27 to Sta. 906+30 (MU-102).  Therefore, if your sole purpose is to save money, this change would not be "in the best interest of the DEPARTMENT OF THE ARMY". However, if the purpose of this change is requested by you for reasons other than the aforementioned, please let us know and we will be glad to quote you additional costs.

Id. at 113.  Mr. Thomas, in turn, responded to plaintiff in a November 16, 2000 letter:

> The change was issued (based on a review of your bid items) to save money and to create for you efficiency in your work efforts.

> In my letter I requested your proposal containing your detail breakdown of the costs of this work.  I requested the details within 10 days.  Since GASA "will be glad to quote you additional costs[,]" it is apparent you can present to me your price proposal by 20 November 2000 at my office at 9:30 am.[29]  I have set aside this time for you to present to me your "written" proposal.  I will have present at this meeting the Contracting Officer so we may rectify our impasse.

Id. at 114 (footnote added).  Plaintiff again responded by letter dated November 16, 2000, this time to Mr. DeStefano:

---

[28]  According to the contract, the actual title of the clause is "Modification Proposals-Price Breakdown."  Def.'s App. 24.

[29]  No explanation was provided by the Corps for why the meeting was scheduled prior to the expiration of the ten-day period originally allowed by the Corps in its November 13, 2000 letter.

> As you are aware[,] GASA, Inc. is poised to commence dredging of contaminated materials from MU-102 . . . pursuant to the terms and conditions of [the] Contract . . . .
>
> We have been informed by Mr. Thomas, as your representative, that the material in this location is not contaminated and is to be dredged as non-contaminated material and now placed in the river.  In furtherance of that complete rewrite of the contract, he hand delivered [the request for a price proposal].
>
> While we question Mr. Thomas'[s] contractual authority to personally make such a directive, we assume he has asserted the position of the Contracting Officer.[30]

Id. at 115 (footnote added).

According to a November 17, 2000 e-mail message from Mr. DeStefano to Mr. Henry, the Corps was confident that all dredged material could be placed back in the river.  PPFUF ¶ 71. In that same e-mail message, Mr. DeStefano indicated that the Corps considered terminating the contract.  Id.  Instead, Mr. DeStefano provided the following suggestion:

> I suggested that if GASA were unwilling to negotiate a unit price for the additional quantities outside the % used in the Variation of Estimated Quantity clause, that the CO issue a unilateral change order pursuant to the Changes clause and that the contractor must continue working.  If the contractor refuses to negotiate a bilateral mod for compensation after the work is done, we could

---

[30]  Mr. Thomas's June 6, 2000 delegation letter provided:

> [Y]ou are designated as Contracting Officer's Authorized Representative for the purpose of and with the authority to take any or all actions in connection with the administration of the . . . contract, which could lawfully be taken by . . . the Contracting Officer exclusive of the authority to execute or agree to any contract modification . . . .  However, the . . . authority granted to you . . . authorizes you to modify a contract which does not exceed $100,000 under the "Changes" . . . and "Suspension of Work" clauses of the contract, subject to your ensuring that funds are available.

Def.'s App. 203; see also id. at 47 (containing the contract clause concerning the contracting officer's authorized representative).  However, ultimately, the contract modification was signed by the contracting officer, Mr. DeStefano.  Pl.'s App. 127-28, 141.

determine what we feel is fair unilaterally and he can file a claim for the balances
he believes he is due, which could end up in court.

Pl.'s App. 117.

Plaintiff and the Corps met to discuss the proposed modification and plaintiff's price
proposal on November 20, 2000.  Id. at 119; see also id. at 114 (indicating that the Corps directed
plaintiff to present its price proposal at 9:30 a.m. on November 20, 2000).  Among the Corps'
representatives at the meeting were Mr. Thomas and Darrin Barber, a Contract Specialist.  Id. at
117, 119, 124.  In an e-mail sent to Mr. DeStefano, Mr. Barber indicated that plaintiff did not
present a price proposal.  Id. at 119 ("The Contractor did not provide assurance that a proposal is
forthcoming.  The Contractor merely stated that within the next day he would tell Joe if a
proposal would be submitted and, if so, when the Government could expect it.").  Mr. Barber
noted that Mr. Thomas's November 13, 2000 request for a price proposal from plaintiff "was
prompted by very recent Corps test results indicating the material is 'non-contaminated' in lieu of
'contaminated.'"  Id.  Mr. Barber indicated that plaintiff objected to the proposed modification as
beyond the scope of the contract and more costly to the government, but that he was unconvinced
by plaintiff's arguments.  Id.  According to Mr. Barber, after plaintiff departed the meeting, the
Corps personnel discussed three options that the contracting officer could pursue: (1) "Issue an
unpriced unilateral modification pursuant to the 'Changes' Clause"; (2) "Withdraw the request
for modification proposal"; or (3) "Terminate that line item for Convenience."  Id.  Mr. Barber
concluded his e-mail by indicating that Mr. Thomas expected plaintiff "to work in a different
contract area in the meantime," but that he could "not recall how much time that will actually
buy" the Corps.  Id.

Plaintiff eventually provided the Corps with a cost proposal for the in-river placement of
dredged materials.  In a November 27, 2000 letter, plaintiff provided cost and time estimates
regarding the difference between the in-river placement of 65,455 cubic yards of dredged
material and the removal of the dredged material to a solid waste disposal facility.  PPFUF ¶ 73.
Plaintiff estimated that the in-river placement would lengthen the Project by 75 days and increase
the cost of the Project by $1,136,000.00.  Id.  Subsequent to plaintiff's November 27, 2000 letter,
Mr. DeStefano, on December 5, 2000, issued unilateral modification P00007 for the in-river
placement of the material dredged from MU-102,[31] reducing the contract amount by
$972,006.80.[32]  Id. ¶ 74.  But then, less than three weeks later, on December 22, 2000, the Corps

_____

[31] In a letter accompanying the modification, Mr. DeStefano informed plaintiff that the
Corps had not received the detailed price proposal pursuant to the contract as requested in its
November 13, 2000 letter.  Pl.'s App. 127.

[32] Specifically, the modification removed the line item for the off-site disposal of 65,455
cubic yards of material dredged from MU-102 and added a line item for the in-river placement of
the same material.  Pl.'s App. 141.  However, no changes were made to the portion of the
contract that dictated that the sediment removed from MU-102 must be disposed of in a

issued modification P00008, which unilaterally rescinded modification P00007.  Id. ¶ 75.  It appears that plaintiff actually began dredging in MU-102 sometime in January 2001.  Def.'s Supp'l App. 132.

At the end of November 2000, plaintiff began to express concern about delay.  In a November 30, 2000 letter to Mr. DeStefano, plaintiff wrote:

> As you are aware, our commencement of the above referenced contract was delayed for 63 critical working days during the summer months of June, July and August, 2000.
>
> . . . .
>
> We are now able to quantify the direct cost amount of our claim regarding the 63 day delay.  The direct cost amount is $317,224.99.  We have detailed this quantity in the attachment.
>
> . . . .
>
> . . . Due to the reduced production caused by the winter weather conditions, this completion date will not be achieved.  We must request that the completion date be extended for at least an additional 60 days under the current contract, through the date when we are compelled by Pennsylvania law to be out of the river.

Pl.'s App. 70-71.  The referenced attachment was a year-to-date general ledger showing all of the costs incurred by plaintiff from January 1, 2000, through August 15, 2000, including a line item for Massimo, dated July 31, 2000, for $21,511.36.  Id. at 72-73.  On December 6, 2000, the Corps responded to plaintiff's letter by indicating that the contracting officer would "respond in the near future."  PPFUF ¶ 87.  Mr. DeStefano eventually responded to plaintiff's letter by letter dated January 12, 2001:

> First, it is the opinion of the Pittsburgh District that the actual number of days from award of contract until issuance of Notice to Proceed differs from the number in your letter.  It is also our opinion that GASA, [I]nc. contributed to the delay in actual work performance due to problems in providing acceptable technical submittals to the Resident Engineer.

---

permitted solid waste disposal facility.  Id.; see Def.'s App. 140 ("MU-102 exceeds the Soil to Groundwater Standard of USEPA Region III Risk-Based Concentration Table, for carbazole.  . . . As a result, the sediments removed from th[is] area[] are not suitable for in-river placement, and are therefore required to be disposed of in a permitted solid-waste disposal facility . . . .").

Second, this office is not cognizant of any instruction provided by Government representatives to your company resulting in any costs above contract requirements.

Nevertheless, in order to settle the issues brought forth by you and in an effort to settle outside the claim arena, the Government is prepared to offer GASA, [I]nc. an extended contract completion date without price adjustment.

Pl.'s App. 75. At no time prior to this letter did the Corps advise plaintiff that it was the Corps' opinion that plaintiff caused or contributed to the delay in issuing the NTP. PPFUF ¶ 52. In a letter dated January 29, 2001,[33] plaintiff rejected the Corps' settlement offer, asserting that plaintiff played no part in the delay in issuing the NTP. Id. ¶ 90.

During the winter and spring months of 2001, adverse weather delayed the Project. The contract allowed for time extensions when the number of work days lost to adverse weather exceeded the number of such days contemplated by the contract. Def.'s App. 56. In the months of January, February, and April 2001, the actual number of days of adverse weather exceeded the number of days contemplated by the contract by ten calendar days, resulting in a ten-calendar-day extension of completion of the contract.[34] Id. at 402-05, 408-09; DPFUF ¶ 83; see also Def.'s App. 56 (indicating that the contract contemplated nine days of weather dely in January, six days of delay each in February and March, and five days of delay in April). The Corps' records indicate that plaintiff's last day of dredging and disposal operations was April 11, 2001. Def.'s App. 409 (noting that work could not be performed from April 12, 2001, through April 14, 2001, due to high water); see also DPFUF ¶ 16 (noting that the contract prohibited any work on the river from April 15 through June 30 of any year).

In the spring of 2001, plaintiff and the Corps disagreed as to how plaintiff would be paid for the placement of material in the in-river placement area. On one hand, in an April 2, 2001 letter, plaintiff asserted: "Pursuant to our telephone conversation, the Government concurs with our contention that the contract specifications clearly state that the payment for In River Placement shall be made in accordance with the quantity of non regulated material dredged from" the in-river placement area. Def.'s App. 427. Yet, on May 29, 2001, the Corps provided plaintiff with final quantity sheets for plaintiff's signature, DPFUF ¶ 102, listing the quantity for

---

[33] The year is incorrect on first page of the letter but correct on the second page.

[34] Prior to January 2001, the actual number of days of adverse weather did not exceed the number contemplated by the contract. DPFUF ¶ 79; see also Def.'s App. 56 (indicating that the contract contemplated four days of adverse weather delay each in July and August, three days of delay each in September and October, four days of delay in November, and seven days of delay in December). However, in September 2000, a month when pool height was not recorded, work was suspended for two days due to high water. DPFUF ¶ 81.

the dredging of material from the in-river placement area as 60,312 cubic yards, Def.'s App. 431, and the quantity for the placement of that material as 42,931 cubic yards, DPFUF ¶ 102.

The Corps received plaintiff's final invoice–Pay Estimate Number 9–on June 20, 2001. Id. ¶ 127.  The invoice included a request for the remaining $100,000.00 of mobilization and demobilization costs, which the Corps paid on June 22, 2001.  Id.  Ultimately, the Corps paid plaintiff a total of $5,514,326.75 for plaintiff's work on the Project.[35]  Id. ¶ 111.  As of February 28, 2003, plaintiff had incurred costs of $4,807,793.44, id. ¶ 110, a figure that plaintiff claims does not include "additional costs incurred by GASA other than direct costs, such as general overhead costs that are attributable to this project," Pl.'s Resp. ¶ 110.

## B.  Procedural History[36]

On June 27, 2001, plaintiff submitted a certified claim to the Corps seeking $3,490,299.32 in damages.  DPFUF ¶¶ 85-86.  Plaintiff's claim identified two "separate forms" of damages.  Id. ¶ 85.  Plaintiff first claimed entitlement to "its anticipated gross profit on the project as bid.  But for the late issuance of the Notice to Proceed, GASA would have actually netted a larger profit than as bid due to certain favorable lower subcontract costs discovered after the project commenced."  Id.  Plaintiff asserted that its "net gross loss from the delay" was $1,517,401.63.  Id.  Second, after asserting that it was "a small company and was unable to utilize its forces and office staff to bid or perform other work during this extended five and one-half month unanticipated work period," plaintiff claimed entitlement to "compensation for lost opportunity/extended overhead during this period."  Id. ¶ 86.  Plaintiff noted that its bid contemplated a gross monthly profit of $358,708.67, and accordingly requested reimbursement of $1,972,897.69 in compensation for lost profit for the additional five-and-one-half months in which it performed under the contract.  Id.  According to plaintiff, its calculations represented

---

[35]  This amount includes the amount of assessed liquidated damages returned to plaintiff on April 26, 2002.  DPFUF ¶¶ 108, 110.  These liquidated damages had been assessed against Pay Estimate Number 9.  Def.'s App. 447.

[36]  Facts in this section are derived from, in addition to the above-mentioned sources, the initial Complaint ("Compl."); the initial Answer; the Amended Complaint ("Am. Compl."); the Second Amended Complaint ("Second Am. Compl."); the January 5, 2004 Joint Status Report ("JSR"); Plaintiff's Motion for Leave to Substitute Expert Witness ("Mot. Substitute"); the September 13, 2005 Joint Status Report ("JSR2"); Defendant's Motion for Summary Judgment ("Mot. Summ. J."); the court's March 16, 2006 order ("Order"); the Third Amended Complaint ("Third Am. Compl."); the exhibits attached to the Third Amended Complaint ("Third Am. Compl. Ex."); Defendant's Renewed Motion for Summary Judgment ("Renewed Mot. Summ. J."); Plaintiff's Motion to Re-open Discovery ("Disc. Mot."); Plaintiff's Unopposed Motion to Resolve Outstanding Discovery and Pleading Issues ("Unopposed Disc. Mot."); and Defendant's Reply to Plaintiff's Opposition to Defendant's Renewed Motion for Summary Judgment ("Renewed Reply").

"the delay damages occasioned by the waiting period preceding the Notice to Proceed, the additional time and cost resulting from performance during the winter months in the river and the inability to complete the final stages of profitable contaminated material removal." Third Am. Compl. Ex. A at 2. Plaintiff's certified claim did not include claims regarding payment for in-river placement of dredged material or the return of assessed liquidated damages.[37]  DPFUF ¶ 87.

The contracting officer denied plaintiff's June 27, 2001 certified claim in a final decision dated August 13, 2001. Id. ¶ 88. The August 13, 2001 decision acknowledged that plaintiff's claim was based upon a delay in the Corps' issuance of the NTP. PPFUF ¶ 93. Meanwhile, in a July 3, 2001 letter, the Corps informed plaintiff that it would collect liquidated damages in the amount of $67,770.00 for fifty-four calendar days of delay. DPFUF ¶ 105.

On November 14, 2001, plaintiff filed a Complaint in this court. Plaintiff alleged one count of breach of contract and sought the return of $67,770.00 in assessed liquidated damages, payment for the in-river placement of material actually dredged, and damages resulting from the purported delay in the issuance of the NTP in the amount of $3,490,299.32, "as recited in the claim letter of June 27, 2001." Compl. ¶¶ 28-35. In its Answer, defendant, as an affirmative defense, averred that plaintiff had not submitted its in-river placement and liquidated damages claims to the contracting officer. Answer ¶ 40. Thus, plaintiff, with the permission of the court,[38] filed an Amended Complaint on March 28, 2002, eliminating its in-river placement and liquidated damages claims. Am. Compl. ¶¶ 28-29.

Subsequently, on April 16, 2002, plaintiff filed a certified claim with the contracting officer seeking the return of liquidated damages, in the amount of $67,770.00, DPFUF ¶ 107, and payment for the in-river placement of dredged material, in the amount of $149,431.82, id. ¶ 103. However, the previous day, in modification P00013, dated April 15, 2002, the Corps had reduced the amount of withheld liquidated damages to $15,591.42. Id. ¶ 106. The reduction accounted for the deletion of the interest portion of the liquidated damages. Id. Thus, on April 26, 2002, the Corps paid plaintiff the difference between the old and new liquidated damages assessments. Id. ¶ 108. The contracting officer then, by final decision dated May 13, 2002, denied the entirety of plaintiff's April 16, 2002 certified claim. Id. ¶¶ 104, 109.

Upon its receipt of the contracting officer's May 13, 2002 final decision, plaintiff filed its Second Amended Complaint on May 31, 2002, which sought the return of $15,591.42 in assessed liquidated damages, payment for the in-river placement of material actually dredged, and damages resulting from the purported delay in the issuance of the NTP in the amount of $3,490,299.32, "as recited in the claim letter of June 27, 2001." Second Am. Compl. ¶¶ 36-38.

---

[37]  Plaintiff was not assessed liquidated damages until July 3, 2001. DPFUF ¶ 105.

[38]  At this time, the case was before another judge. The case was ultimately reassigned to the undersigned on January 4, 2006.

The parties completed fact and expert discovery in this case by January 5, 2004, and it appears that the parties then engaged in settlement discussions.  JSR ¶ 1.  However, the case continued on a litigation track.  In a December 1, 2004 motion, plaintiff sought to replace its liability expert witness due to the death of its initial expert.  Mot. Substitute 1-2.  By September 13, 2005, the parties had completed fact and expert discovery, but for plaintiff's production of a few documents requested by defendant.  JSR2 ¶ 1.

Pursuant to a court-ordered briefing schedule, defendant filed its Motion for Summary Judgment on November 22, 2005.  In its motion, defendant contended that the court lacked jurisdiction over plaintiff's claim for delay damages because plaintiff's new liability expert, Michel J. Sadaka, "offer[ed] a new delay analysis" and new calculations of delay damages that had not been presented to the contracting officer via a certified claim.  Mot. Summ. J. 24-26.  Plaintiff filed its opposition to defendant's motion on December 29, 2005,[39] and defendant filed its reply on January 20, 2006.  The court heard argument on defendant's motion on March 15, 2006.  In a March 16, 2006 order, the court informed the parties that it "believe[d] that it may lack jurisdiction over plaintiff's claim for delay damages" and encouraged plaintiff "to consider filing a certified claim with the contracting officer to remove the alleged jurisdictional impediment."  Order 1.

To foreclose the possibility of dismissal of its delay damages claim, plaintiff filed another certified claim with the contracting officer addressing delay damages on April 12, 2006.  DPFUF ¶ 112.  Plaintiff sought total damages of $1,906,718.43 plus interest in this certified claim, an amount that encompassed the return of $15,591.42 in assessed liquidated damages, compensation related to the in-river placement of dredged material in the amount of $178,737.57, and delay-related damages of $1,712,389.44.  Third Am. Compl. Ex. E at 3.  Plaintiff's claim for in-river placement compensation consisted of two elements.  First, plaintiff claimed $29,305.70 in unreimbursed expenses for the disposal of certain material dredged from the in-river placement area at a permitted solid waste disposal facility.  DPFUF ¶ 118.  Second, plaintiff sought additional compensation for the in-river placement of dredged material, in the amount of $149,431.87, claiming that it placed more material back in the river than what was paid for by the Corps.  Third Am. Compl. Ex. E at 3.  Plaintiff's delay-related damages were also further broken down into distinct elements.  First, plaintiff contended that it incurred direct costs related to the Corps' purported delay in issuing the NTP of $284,417.20.  Id.  Second, plaintiff claimed damages of $408,974.15 for work that it was unable to complete before the contract-mandated stoppage date of April 15, 2001, due to the alleged delaying actions of the Corps.  Id.  Third, plaintiff sought compensation in the amount of $1,018,998.09 for its extended field costs, encountered from December 31, 2000, through April 15, 2001, which resulted from the alleged delaying actions of the Corps.  Id.  In an April 28, 2006 letter, the contracting officer sought clarification of plaintiff's claims, DPFUF ¶ 113, including when precisely plaintiff incurred the $284,417.20 in direct costs, Third Am. Compl. Ex. E at 6.  Plaintiff provided the requested

---

[39] Plaintiff subsequently filed, by leave of court, a "corrected copy" of its opposition on January 4, 2006.  Citations to plaintiff's opposition will be to the corrected copy.

clarification in a May 16, 2006 letter, DPFUF ¶ 114, including a confirmation that it incurred the requested direct costs between April 20, 2000, and August 14, 2000, Third Am. Compl. Ex. E at 9. The contracting officer rejected plaintiff's April 12, 2006 certified claim in its entirety on July 7, 2006. DPFUF ¶ 115.

Upon the contracting officer's rejection of its certified claim, plaintiff, with the court's permission, filed its Third Amended Complaint on August 3, 2006. In its Third Amended Complaint, plaintiff seeks the same damages presented to the contracting officer in its April 12, 2006 certified claim.[40] Third Am. Compl. ¶ 67. Plaintiff specifies four ways in which the Corps caused its delay-related damages: the Corps delayed the issuance of the NTP; delayed the start of plaintiff's work until September 21, 2000; hindered and interfered with plaintiff's prosecution of the work; and prohibited plaintiff from mitigating the Corps-caused delays. Id. ¶ 66.

Defendant filed a Renewed Motion for Summary Judgment on September 20, 2006, which added arguments to those made in its original motion necessitated by the new allegations raised in the Third Amended Complaint. Renewed Mot. Summ. J. 2, 4. In response to defendant's renewed motion, plaintiff moved for permission to conduct limited discovery on September 27, 2006. Disc. Mot. ¶ 9. The parties agreed to limited discovery and an extension of the briefing schedule. Unopposed Disc. Mot. ¶¶ 1-5. Accordingly, after the limited discovery concluded, plaintiff filed its opposition to defendant's renewed motion on March 2, 2007, and defendant filed its renewed reply on June 1, 2007. The court deems oral argument unnecessary.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The moving party may discharge its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. Id. at 324. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. The nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. Id.

_____

[40] Accordingly, defendant alleges that plaintiff has abandoned the damages claims presented in the June 27, 2001 certified claim. See Renewed Mot. Summ. J. 10 n.4.

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Entry of summary judgment is mandated, "after adequate time for discovery," against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

## III.  DELAY

Plaintiff generally alleges that the Corps "breached the contract and its implied covenants" by delaying work in the following ways: (1) the Corps delayed issuing the NTP; (2) the Corps prevented plaintiff from beginning contract work for over a month after the Corps issued the NTP; (3) the Corps hindered or interfered with plaintiff's work after work had commenced; and (4) the Corps did not permit plaintiff to mitigate the delays.  Third Am. Compl. ¶ 66.  Defendant argues that there is no genuine issue of material fact that the Corps did not cause any delay on the Project.  Mot. Summ. J. 3-5; Renewed Mot. Summ. J. 2-3.

Compensation for unreasonable delay is available via the contract's Suspension of Work clause.[41]  See 48 C.F.R. § 52.242-14 (2005), cited in Def.'s App. 24 (indicating that the Suspension of Work clause was incorporated by reference into the contract).  The Suspension of Work clause provides, in part:

> If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

---

[41]  Recovery under the Suspension of Work clause is a substitute for a breach of contract remedy.  See S.A. Healy Co. v. United States, 576 F.2d 299, 308 (Ct. Cl. 1978) ("[D]efendant's conduct would be a breach of contract except for the suspension of work clause, which converts the situation into a constructive suspension compensable by an equitable adjustment under the contract."); Merritt-Chapman & Scott Corp. v. United States, 439 F.2d 185, 191 (Ct. Cl. 1971) ("This would have been a breach of contract and actionable, in the absence of a clause such as the 'Suspension of Work' article."); Louis Leustek & Sons, Inc. v. United States, 41 Fed. Cl. 657, 667 n.7 (1998) ("The government has implemented provisions such as the suspension of work clause in its contracts 'in order to avoid liability for breach of contract when effecting contract modifications, which inevitably arise.'"  (citing Steven J. Weber et al., The Recoverability of the Cost of Borrowing in Construction Contracts, 27 Pub. Cont. L.J. 17, 31 (1997))).  Thus, the court will analyze plaintiff's delay claim under the Suspension of Work clause.

-33-

48 C.F.R. § 52.242-14(b).  To prevail on a delay claim, plaintiff must show that the Corps' action or inaction caused work to be delayed on the contract for an unreasonable length of time, that it was injured by the delay, and that it did not concurrently delay work on the contract.  See id. ("[N]o adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor . . . ."); Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (holding that the government must perform its contractual obligations within a reasonable time); id. at 1292 ("A contractor cannot recover where the delays are concurrent or intertwined and the contractor has not met its burden of separating its delays from those chargeable to the Government."  (citation and quotation omitted)); Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc) ("[T]he contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor.").

Plaintiff divides its delay claim into four separate time periods.[42]  However, the court takes a slightly different approach.  The court first determines whether there is a genuine issue of material fact as to (1) whether Corps action or inaction caused a delay; (2) the extent of any Corps-caused delay; and (3) whether the length of any Corps-caused delay was unreasonable. The court then examines whether a genuine issue of material fact exists as to whether plaintiff was injured by any Corps-caused delay.  Finally, the court discusses whether there is a genuine issue of material fact regarding whether plaintiff caused any concurrent delay that mitigates any delay caused by the Corps.

### A.  The Existence, Extent, and Reasonableness of Any Corps-Caused Delay

To determine the existence, extent, and reasonableness of any Corps-caused delay, the court examines three distinct time periods: from contract award until the Corps' issuance of the NTP, from the Corps' issuance of the NTP until the commencement of work, and from the commencement of work until the completion of work.

### 1.  The Corps Delayed Issuing the NTP

Plaintiff first alleges that the Corps breached the contract by impermissibly and unreasonably delaying its issuance of the NTP.  Third Am. Compl. ¶ 66(a).  Defendant contends that the Corps did not unreasonably delay issuing the NTP.  Mot. Summ. J. 5-17.  Pursuant to the Suspension of Work clause, the court must determine whether the Corps delayed issuing the NTP

---

[42]  These time periods include: (1) date of bid until date of NTP (April 20, 2000, to August 14, 2000); (2) date of NTP until date dredging commenced (August 15, 2000, to September 20, 2000); (3) date dredging commenced until plaintiff's planned completion date (September 21, 2000, to December 31, 2000); and (4) plaintiff's planned completion date until actual completion date (December 31, 2000, to April 15, 2001).  Third Am. Compl. ¶¶ 12-63.

and, if so, whether the delay was "for an unreasonable period of time."  48 C.F.R. § 52.242-14(b).

The contract did not provide a date certain on or by which the Corps was to issue the NTP.  DPFUF ¶ 14.  However, the Corps made certain representations to plaintiff, both within and outside the contract, that bear on the timing of the NTP.  Contained within the contract was a provision conditioning the Corps' issuance of the NTP upon plaintiff's submission of a Propelling Unit Agreement.  The contract provided: "The written agreement between the Contractor and the lessor documenting the requirement for required propelling unit to be on site within the specified time limit shall be provided to the Contracting Officer prior to issuance of the Notice to Proceed."  Def.'s App. 71.  The contract also required government approval of the Propelling Unit Agreement, id., but the parties disagree as to whether government approval was necessary prior to the Corps' issuance of the NTP.  Defendant argues that prior approval was necessary, Mot. Summ. J. 11-12, while plaintiff argues that submission of a Propelling Unit Agreement was all that the contract required, Pl.'s Br. Opp'n Def.'s Mot. Summ. J. ("Opp'n") 13-14.  Defendant's view cannot prevail.  At the time the Corps issued the NTP, the Corps was not–in its own opinion–in possession of a government-approved Propelling Unit Agreement.  The Corps had rejected plaintiff's initial Propelling Unit Agreement on July 31, 2001,[43] DPFUF ¶ 42, and took no further action related to plaintiff's Propelling Unit Agreement until August 17, 2000, id. ¶¶ 52-53, three days after issuing the NTP.  Thus, by issuing the NTP before its receipt of a satisfactory Propelling Unit Agreement, the Corps waived the asserted contractual requirement that plaintiff submit an approved Propelling Unit Agreement prior to the issuance of the NTP.  See Gresham & Co. v. United States, 470 F.2d 542, 555 (Ct. Cl. 1972) ("The waiver of a contract provision requires a responsible officer assigned the function of overseeing the essentials of contract performance . . . .  Such a waiver by one with such authority will estop the Government.").  Accordingly, the court will consider plaintiff to have met the contractual requirement for a Propelling Unit Agreement as of July 12, 2000.

In addition to the one relevant contract provision, the Corps made several authoritative oral and written representations to plaintiff about when it would issue the NTP.  First, in the contract award letter, the contracting officer indicated that, "[u]pon return to this office of the bonds, properly executed, Notice to Proceed will be issued."  PPFUF ¶ 9.  "Contracting officers have authority to enter into, administer, or terminate contracts and make related determinations and findings."  48 C.F.R. § 1.602-1; see Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("[C]ontracting officers have the authority to, among other things, administer the contract . . . .").  Thus, because the decision of when to issue the NTP is a matter of contract administration, plaintiff was entitled to rely on the contracting officer's

---

[43]  Plaintiff argues that (1) the Corps should have approved plaintiff's July 12, 2000 Propelling Unit Agreement and (2) the Corps ultimately did approve plaintiff's July 12, 2000 Propelling Unit Agreement.  See Opp'n 13-14.  However, because the court is more narrowly focused on how the Corps' actions contradicted the Corps' interpretation of the contract terms, plaintiff's contentions are irrelevant.

representation.  Although the contracting officer did not specify an exact time within which the Corps would issue the NTP, the language he used in the letter implied relative immediacy.

Then, during the June 23, 2000 postaward, preconstruction conference, the Corps informed plaintiff that it anticipated that the NTP would issue during the week of June 26, 2000. DPFUF ¶ 27.  Mr. Thomas, the contracting officer's authorized representative, was present at the meeting, and had the authority to administer the contract.  Def.'s App. 203.  Thus, plaintiff was entitled to rely on the Corps' representation at this meeting.

In contrast to its early representations to plaintiff, the Corps began to back off its proposed NTP date after the postaward, preconstruction conference.  On June 28, 2000, the contracting officer warned plaintiff to expect contract termination, a warning that the Corps retracted later that day.  PPFUF ¶¶ 19-21.  Then, during a July 27, 2000 meeting, the contracting officer and other Corps personnel presented plaintiff with the options of contract termination or delaying the NTP until late fiscal year 2001 (i.e., about one year later).  Id. ¶ 31; DPFUF ¶ 36. Finally, in an August 3, 2000 letter, the contracting officer indicated that the NTP could not be issued at that time and suggested the suspension of the NTP until October 1, 2001 (i.e., fiscal year 2002).  DPFUF ¶ 43.

In summary, the Corps made four nonharmonious, authoritative representations concerning the date the NTP would issue.  The Corps claimed that it would issue the NTP (1) upon plaintiff's return of the payment and performance bonds; (2) during the week of June 26, 2000; (3) in late fiscal year 2001; and (4) in fiscal year 2002.  Thus, as time elapsed, the Corps' projected NTP date was reset to later dates.  Clearly, the Corps delayed issuing the NTP.[44]

To determine whether the Corps delayed issuing the NTP "for an unreasonable period of time" pursuant to the Suspension of Work clause, the court must first ascertain the length of the delay.  Defendant contends that the period of delay should be measured from the anticipated NTP date plaintiff indicated in its July 15, 2000 construction progress schedule, to the date the Corps actually issued the NTP.  Mot. Summ. J. 10.  Because plaintiff indicated a July 17, 2000 NTP, defendant calculated a delay of twenty-eight days.[45]  Id.  However, plaintiff claims a much lengthier delay.  See, e.g., Pl.'s App. 70-71 (claiming a delay of sixty-three days).

---

[44]  Defendant repeatedly refers to the Corps' delay in issuing the NTP as an "alleged delay," Mot. Summ. J. 6, 8-10, 12, 15, 21-22, and argues that the Corps did not delay issuing the NTP, id. at 6-8.  However, the Corps essentially admitted to such a delay in an internal e-mail dated August 9, 2000.  See Def.'s App. 256 (noting that "[t]he Government has subsequently delayed the issuance of the NTP . . .").

[45]  In a subsequent brief, taking an "optimistic view," defendant contemplates a thirty-three-day delay, from the date plaintiff submitted its initial Propelling Unit Agreement to the date the Corps issued the NTP.  Renewed Reply 3-4.

Based upon the parties' submissions, the court finds that there is a genuine issue of material fact as to the length of the Corps' delay in issuing the NTP.  First, the basis of defendant's calculation of the length of the delay is not persuasive.  The dates contained in plaintiff's July 15, 2000 construction progress schedule must be considered in conjunction with the contract requirements and the contracting officer's earlier representations concerning when the NTP would issue.  Before plaintiff submitted its construction schedule on July 15, 2000, it had been under the impression that so long as it submitted a Propelling Unit Agreement, the Corps would imminently issue the NTP, either upon its submission of payment and performance bonds or during the week of June 26, 2000.  Then, when plaintiff did submit its construction progress schedule, plaintiff remained under the belief that because it submitted a Propelling Unit Agreement, the NTP was imminent, as plaintiff was not provided with another NTP date until July 27, 2000.  Altogether, once plaintiff submitted a Propelling Unit Agreement, regardless of what plaintiff requested or anticipated, the Corps controlled the issuance of the NTP.  Thus, plaintiff's expectations are not relevant.

Plaintiff does not explain how it arrived at a total delay of sixty-three days.  However, plaintiff does cite evidence that supports a delay that spanned from July 12, 2000–when plaintiff submitted a Propelling Unit Agreement–to August 14, 2000–when the Corps issued the NTP–for a total delay of approximately thirty-three days.  See Def.'s App. 71 (containing the contract's requirement that plaintiff submit a Propelling Unit Agreement prior to the Corps' issuance of the NTP); PPFUF ¶ 9 (citing the Corps' June 6, 2000 letter indicating that the Corps would issue the NTP "upon return to this office of the bonds"); Pl.'s Resp. ¶ 27 (agreeing that the Corps represented at the postaward, preconstruction conference that it would issue the NTP during the week of June 26, 2000); PPFUF ¶¶ 19-21, 31, 36 (citing evidence indicating that the Corps represented at various times that the contract would be terminated or that the issuance of the NTP would be delayed for one year or longer); id. ¶ 49 (indicating the Corps issued the NTP on August 14, 2000).  For summary judgment purposes, the court makes factual inferences in favor of the nonmoving party.  Matsushita Elec. Ind. Co., 475 U.S. at 587.  Accordingly, plaintiff has cited sufficient evidence to raise a genuine issue of material fact about the length of the Corps' delay in issuing the NTP.

Because the length of the Corps' delay in issuing the NTP remains at issue, the court has no basis for determining whether the delay was for "an unreasonable period of time."  However, the parties both address the reasonableness of the delay in their respective briefs, with defendant assuming a twenty-eight-day delay, Mot. Summ. J. 10, and plaintiff assuming a sixty-three-day delay, Pl.'s App. 70-71.  Because the parties' arguments concerning reasonableness address one of the underlying bases for plaintiff's allegations and will have greater significance as this case proceeds, the court finds that it would be useful to discuss these arguments here.  As the court noted above, the record as it currently stands supports a Corps-caused delay of thirty-three days.  Thus, the court will assume a thirty-three-day delay in analyzing the parties' contentions about whether the Corps delayed issuing the NTP for "an unreasonable period of time."

"What is a reasonable period of time for the government to do a particular act under the contract is entirely dependent upon the circumstances of the particular case." Tri-Cor, Inc. v. United States, 458 F.2d 112, 131 (Ct. Cl. 1972) (per curiam).  Defendant, in support of its contention that a twenty-eight-day delay is reasonable, cites three cases–one each from the United States Court of Claims ("Court of Claims"), the United States Court of Federal Claims ("Court of Federal Claims"), and the Armed Services Board of Contract Appeals ("ASBCA")–where it claims that the length of delay in issuing the NTP was found to be reasonable.  Mot. Summ. J. 10-11.  Because the reasonableness inquiry is fact-dependant, the court examines the facts of each case.

In defendant's first cited case, De Matteo Construction Co. v. United States, 600 F.2d 1384 (Ct. Cl. 1979), De Matteo Construction Company ("De Matteo") sought damages for a purported thirty-one-day delay in the government's issuance of the NTP.  Id. at 1386, 1391.  On June 21, 1974, the government notified De Matteo that it was the successful bidder on a contract to construct a post office building, instructed De Matteo to return executed copies of the contract and its bonds within ten days, and indicated that upon approval of De Matteo's bonds, it would itself execute the contract and send it back to De Matteo.  Id. at 1386.  The fully executed contract would serve as the NTP.  Id.  De Matteo complied with the government's instructions on July 2, 1974, but the government did not immediately return to De Matteo a fully executed contract due to a protest by a competing bidder.  Id. at 1386-87.  De Matteo did not receive the fully executed contract until August 14, 1974, after the bid protest had been resolved.  Id. at 1387.  The Court of Claims held that De Matteo was not "subjected to an unreasonable delay" because the government both mailed the fully executed contract to De Matteo within the time permitted by the contract (sixty days from the bid opening date) and fully disposed of the bid protest within the time permitted by government regulation (sixty-five days from the date the protest was filed).  Id. at 1390-91.  De Matteo Construction Co. is distinguishable from the instant case because in De Matteo Construction Co., the contract was not fully executed prior to the government's issuance of the NTP.  Instead, in the instant case, the NTP delay occurred after plaintiff and the Corps executed the contract.

The second case cited by defendant is Commercial Contractors, Inc. v. United States, 29 Fed. Cl. 654 (1993).  In that case, Commercial Contractors, Inc. ("Commercial") sought damages for an alleged thirty-six-day delay in the government's issuance of the NTP.  Id. at 662.  The government awarded a contract to reconstruct an airfield runway to Commercial on August 25, 1987, but did not issue the NTP until October 26, 1987.  Id. at 657.  Commercial claimed that at a preconstruction conference held on September 10, 1987, the government promised that it would issue the NTP within ten days of receiving Commercial's bonds.  Id. at 662-63.  Commercial also claimed that it submitted acceptable bonds on September 17, 1987, that it therefore expected the NTP by September 27, 1987, and that the government's failure to issue the NTP until November 2, 1987, was unreasonable.  Id.  As a preliminary matter, the Court of Federal Claims held that Commercial had not provided reliable evidence to support its assertion that the government promised an NTP within ten days of receiving the bonds.  Id. at 663.  This is unlike the instant case, where the Corps promised, both orally and in writing, that it would issue

the NTP upon plaintiff's return of the payment and performance bonds.  The Court of Federal Claims in <u>Commercial Contractors, Inc.</u> then held that the time it took the government to process Commercial's bonds was not unreasonable.  <u>Id.</u> at 663-64.  Again, the facts in <u>Commercial Contractors, Inc.</u> are dissimilar to those presented by the instant case, where there is no dispute about the length of time required to process plaintiff's bonds.  Indeed, in the instant case, plaintiff contends that the delay in the Corps' issuance of the NTP began, at the earliest, on the date the government accepted its bonds–June 22, 2000.

In the final case relied upon by defendant, Marine Construction & Dredging, Inc. ("Marine") was awarded a contact to dredge a reservoir.  <u>Marine Constr. & Dredging, Inc.</u>, ASBCA Nos. 38,412, 38,538, 90-1 B.C.A. (CCH) ¶ 22,573 (Dec. 12, 1989).  The contract, which contemplated an NTP issuance date of October 1, 1987, required Marine to complete work by December 10, 1987.  <u>Id.</u>  However, prior to contract award, the government became aware that a permit allowed the reservoir to be dredged only from May 15 through July 15.  <u>Id.</u>  Despite this limitation, the government awarded the contract to Marine without changing the contemplated NTP date or the contract completion date.  <u>Id.</u>  The government did not issue the NTP until April 25, 1988, and thus Marine sought damages for an approximate delay of six months.  <u>Id.</u>  The government claimed that its delay in issuing the NTP was reasonable because (1) the contract did not specify a specific date on or by which it would issue the NTP; (2) the contract only required the government to extend the completion date if the NTP was delayed and thus Marine was not entitled to a price adjustment; (3) Marine was concurrently responsible for the delay due to defective bonds and proof of insurance; and (4) the foreseeable harsh winter weather would have prevented Marine from completing the contract before the spring of 1988.  <u>Id.</u>  The ASBCA held that the reasonableness of the government's delay in issuing the NTP was a disputed fact and therefore it could not hold that "the issuance of the notice to proceed [was] unreasonable as a matter of law."  <u>Id.</u>  Because the ASBCA did not issue a ruling on reasonableness, its decision does not support defendant's argument in the instant case.  In sum, the court finds that none of the cases cited by defendant adequately support its argument that a twenty-eight-day delay is per se reasonable.

In addition to arguing that the absolute length of the Corps' delay in issuing the NTP was reasonable, defendant argues that the purpose of the delay requires a finding that the length of the delay was reasonable.  Mot. Summ. J. 9-10.  Specifically, defendant asserts that the Corps was prevented from issuing the NTP by the Antideficiency Act, which prohibits government employees from spending or obligating funds in excess of the amount appropriated by

Congress.[46] Id. at 9 (citing 31 U.S.C. § 1341(a) (2000)).  Plaintiff disputes defendant's assertion that the Corps lacked available funds.  Opp'n 6-12.

The March 20, 2000 solicitation indicated that $5,200,000.00 "had been reserved" for the contract for the current fiscal year–October 1, 1999, through September 30, 2000–and that the Corps expected Congress to appropriate the necessary funds for future fiscal years.  Def.'s App. 59.  The Corps did not amend the solicitation to change the allocated amount, leaving plaintiff with no reason to suspect that contract funding would be problematic.  In fact, up until the moment plaintiff was awarded the contract, it believed that Congress had appropriated, and it could earn, up to $5,200,000.00 through September 30, 2000, a substantial portion of the contract.[47]  However, upon receiving a fully executed copy of the contract, plaintiff learned that the Corps had almost immediately thereafter issued a unilateral contact modification, reducing the amount allocated to the contract during the current fiscal year to $100,000.00.  DPFUF ¶ 11. This deobligation of funds significantly reduced the amount of work plaintiff could accomplish under the contract prior to October 1, 2000.[48]

Based upon the information provided in the record before it, the court discounts defendant's contention that the Corps feared violating the Antideficiency Act.  The Corps awarded the contract with $5,200,000.00 allocated for the current fiscal year.[49]  Because the

---

[46]  The relevant portion of the Antideficiency Act is as follows:

(a)(1)  An officer or employee of the United States Government or the District of Columbia government may not–

(A)  make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;

(B)  involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law; . . . .

31 U.S.C. § 1341(a)(1)(A)-(B).

[47]  Using plaintiff's bid as the denominator, $5,200,000.00 represented either 67.8% of the total contract price (with awardable option items) or 81.1% of the total contract price (without the awardable option items).

[48]  Again, using plaintiff's bid as the denominator, $100,000.00 represented either 1.3% of the total contract price (with awardable option items) or 1.6% of the total contract price (without the awardable option items).

[49]  Defendant characterizes the amount of funds available for contract performance upon the award of the contract as follows: "On the date of award, the contract had reserved an initial

Antideficiency Act prohibited the Corps from obligating funds in excess of congressional appropriations, the Corps must have had $5,200,000.00 available for the contract upon award. The fact that the Corps subsequently modified the contract to reduce the amount of available funds does not negate the fact that $5,200,000.00 was available when the Corps executed the contract.[50]  While defendant is correct that "the Continuing Contracts clause allows the Corps to award construction contracts without having appropriated funds available for obligation in the full contract amount," Reply 7, the Antideficiency Act still prevented the Corps from awarding a contract with an amount greater than what it had in appropriations for that fiscal year.  The Corps should not have executed the contract if it lacked sufficient funding.  Thus, while the Corps may have been motivated to delay issuing the NTP due to funding concerns, see, e.g., Pl.'s App. 49-

---

amount of $100,000 for performance of the contract, with the expectation of FY 2000 funding of $5,200,000." Mot. Summ. J. 9 n.3.  This is a mischaracterization of the contract.  The contract was awarded with the following language: "The sum of $5,200,000.00 has been reserved for this contract and is available for payments to the Contractor during the current fiscal year."  Def.'s App. 59.  Then, after the Corps executed the contract, it modified the contract to read: "The sum of $100,000.00 has been reserved for this contract and is available for payments to the Contractor during the current fiscal year."  DPFUF ¶ 11.  The modification then indicated that "[a]dditional funds will be obligated around 1 July and subsequently in early August and September consistent with what we anticipate you will earn in each of those months."  Id.  Thus, contrary to defendant's assertion, on the date of award, the contract reserved an initial amount of $5,200,000.00, subsequently reduced to $100,000.00, and contained no expectation that funding up to $5,200,000.00 would be available for the remainder of the fiscal year.

    [50]  In fact, the court finds the Corps' significant reduction of the amount allegedly allocated to the contract immediately upon contract award to be highly suspect.  The language of the Continuing Contracts clause appears to allow for increases in obligated funds, but not decreases, despite defendant's argument to the contrary.  See Def.'s Reply Br. ("Reply") 7.  Indeed, the very nature of the Antideficiency Act–preventing the obligation of nonappropriated funds–appears to prevent any reduction of the initial amount in the Continuing Contracts clause. The court fails to understand how the Corps could execute the contract with $5,200,000.00 in appropriated funds, and then suddenly, that same day, not have $5,100,000.00 of those funds available.  Certainly, had the Corps been previously aware that it would not have the entire $5,200,000.00 available to fund the contract for the current fiscal year, it would have amended the solicitation.  However, the Corps did not choose this course of action–the record contains evidence that the Corps was aware of funding issues but chose to proceed with the award of the contract anyway.  See Def.'s App. 180 (containing Mr. Smiley's May 25, 2000 e-mail).  In sum, it appears that the only explanation for the Corps' quick reduction in allocated funds is that the Corps did not have $5,100,000.00 of the funds available in the first place, and this leads the court to suspect that the Corps may have violated the Antideficiency Act when it executed the contract.

50, 53; PPFUF ¶¶ 19, 35; Def.'s App. 246; DPFUF ¶ 43, the court is unconvinced that those funding concerns were legitimate.[51]

Further evidence presented by plaintiff raises the specter that the Corps' delay in issuing the NTP was unreasonable.  In particular, the court notes that the Corps failed to adhere to the authoritative representations it made to plaintiff concerning when it would issue the NTP, despite having received plaintiff's Propelling Unit Agreement.  For one, the Corps neither terminated the contract nor delayed the NTP until late fiscal year 2001, as represented at a July 27, 2000 meeting.  And, the Corps did not delay the NTP until fiscal year 2002, as suggested in its August 3, 2000 letter.  Instead, despite its representations to plaintiff, the Corps issued the NTP on August 14, 2000.  DPFUF ¶ 49.  The court questions how many misrepresentations by the Corps that plaintiff was required to endure before it could prove an unreasonable delay.

In sum, the court finds that the Corps delayed issuing the NTP, that plaintiff has raised a genuine issue of material fact concerning the length of the delay, and that without knowing the length of the delay, the court cannot determine whether the delay endured for an unreasonable length of time.  Accordingly, there remains a genuine issue of material fact as to whether the Corps unreasonably delayed issuing the NTP.

## 2.  The Corps Did Not Delay Plaintiff's Commencement of Work

Plaintiff next alleges that the Corps breached the contract by impermissibly prohibiting plaintiff from beginning work on the contract until September 21, 2000.  Third Am. Compl. ¶ 66(b).  Specifically, plaintiff contends that the Corps inappropriately rejected certain submittals in an effort to delay plaintiff's commencement of work.  Id. ¶¶ 41-46.  Defendant responds that plaintiff bears responsibility for failing "to timely submit and obtain approval of its various contractually-required plans and submittals."  Mot. Summ. J. 19.  Given these contentions, the court must determine whether the Corps delayed plaintiff's commencement of work and, if so, whether the delay was "for an unreasonable period of time."  48 C.F.R. § 52.242-14(b).

The contract required plaintiff to furnish the Corps with a number of submittals.  However, the contract provided specific deadlines with respect to only a few of those submittals: the Environmental Protection Plan, the Quality Control Plan, the Work Plan for the Disposal of Materials, and the Operations Plan.  First, with respect to the Environmental Protection Plan, the contract provided:

> Within 10 calendar days of receipt of the Notice to Proceed, the Contractor shall submit an Environmental Protection Plan for review and acceptance by the Contracting Officer.  The Government will consider an interim plan for the first

---

[51]  In fact, according to the contracting officer, "In awarding this contract on June 8, 2000 [sic], we had anticipated that funds would be available for this contract in fiscal years 2000 and 2001."  PPFUF ¶ 35.

30 days of operations. However, the Contractor shall furnish an acceptable final plan not later than 60 calendar days after receipt of the Notice to Proceed. . . . No physical work at the site shall begin prior to acceptance of the Contractor's plan or an interim plan covering the work to be performed.

Def.'s App. 112. Next, with respect to the Quality Control Plan, the contract provided:

The Contractor shall furnish for review by the Government, not later than 30 days after receipt of notice to proceed, the Contractor Quality Control (CQC) Plan . . . . The government will consider an interim plan for the first 90 days of operation. Construction will be permitted to begin only after acceptance of the CQC plan or acceptance of an interim plan applicable to the particular feature of work to be started.

Id. at 119; see also id. at 120 ("Acceptance of the Contractor's [Quality Control] plan is required prior to the start of construction."). The third submittal with a specific deadline was the Work Plan for the Disposal of Materials, about which the contract provided: "No work shall commence until the Contractor has received the Contracting Officer's approval in writing." Id. at 128. Finally, with respect to the Operations Plan, the contract specified: "This plan shall be submitted for review and approval by the Government prior to beginning dredging and placement operations." Id. at 138.

The contract did not provide specific deadlines for other submittals, such as the Accident Prevention Plan, the Qualifications of Hydrographic Surveying Firm, and the Surveying Quality Control Plan. Id. at 78-84, 138. However, at the June 23, 2000 postaward, preconstruction conference attended by the contracting officer's authorized representative, the Corps informed plaintiff that it could not begin work on the contract until it had submitted an Accident Prevention Plan. Id. at 222-23. In addition, it would be nonsensical to contend that these three submittals were not required before plaintiff began work on the contract, due to the very nature of the submittals. C.f. id. at 96 ("Submittals requiring Government approval shall be scheduled and made prior to the acquisition of the material or equipment covered thereby."). In particular, logic dictates that an Accident Prevention Plan was required prior to the commencement of any physical work on the contract (i.e., surveying or dredging) and that the Qualifications of Hydrographic Surveying Firm and Surveying Quality Control Plan were required prior to the commencement of the predredging surveys.[52]

All seven of these submittals–the Environmental Protection Plan, the Quality Control Plan, the Work Plan for the Disposal of Materials, the Operations Plan, the Accident Prevention Plan, the Qualifications of Hydrographic Surveying Firm, and the Surveying Quality Control

---

[52] However, as the court notes below, the Corps ultimately permitted plaintiff to begin the predredging survey prior to plaintiff's submission of the Qualifications of Hydrographic Surveying Firm and Surveying Quality Control Plan.

Plan–required government approval.  Id. at 78, 111, 118, 128, 137-38.  The contract allowed the Corps "a minimum of 30 calendar days" in which to review and approve plaintiff's submittals. Id. at 96.  If the Corps disapproved a submittal, id. at 95, plaintiff was allowed "[a] minimum of 30 days . . . for any required resubmittal,"[53] id. at 96.

The court must ascertain whether the parties complied with the contractual requirements and authoritative statements concerning submittals, starting with the Environmental Protection Plan.  Plaintiff submitted its initial Environmental Protection Plan on August 29, 2000, PPFUF ¶ 102, fifteen days after the Corps issued the NTP.  Pursuant to the terms of the contract, plaintiff's Environmental Protection Plan was five days overdue.  The Corps rejected the plan the next day, id., plaintiff resubmitted a plan on September 8, 2000, Def.'s App. 277, and the Corps approved the resubmitted plan on September 11, 2000, id.  The rejection, resubmission, and final approval all took place within the contractually acceptable thirty-day time periods, and an acceptable plan was furnished within sixty days of the NTP.  Thus, aside from plaintiff' initial five-day delay in submitting an Environmental Protection Plan, the parties were in contract compliance.  The parties' main dispute concerning the Environmental Protection Plan centers on the following contractual provision: "The Government will consider an interim plan for the first 30 days of operations."  Defendant contends that plaintiff "never submitted any interim plans in accordance with the contract."  Renewed Mot. Summ. J. 5.  On the other hand, plaintiff implies that the Corps should have treated plaintiff's initial Environmental Protection Plan as an interim plan.[54]  Opp'n 13; Pl.'s Br. Opp'n Def.'s Renewed Mot. Summ. J. ("Renewed Opp'n") 19-20.  Thus, the court infers that plaintiff believed that it met the contract's requirement for an Environmental Protection Plan, albeit five days late, on August 29, 2000.

Beyond the previously quoted language, the contract contains no provisions explaining the workings of an interim Environmental Protection Plan.  "When the matter in dispute is not expressly provided for in the contract, it is necessary to determine whether the contractor's interpretation of the contract requirements was reasonable."  C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993); see also id. at 1544 (noting that the court's sole inquiry is the contractor's interpretation of the contract).  In the instant case, the one sentence concerning the interim Environmental Protection Plan is full of ambiguity: (1) Is the contractor required to designate a plan as an interim plan?; (2) Is the government required to consider any

---

[53]  It bears noting that while the contract permitted these generous time periods for the approval and resubmission of plaintiff's submittals and forbade work before plaintiff provided the submittals, the contract also required plaintiff to begin work within ten days of the NTP. Def.'s App. 19.  Nevertheless, these internal inconsistencies within the contract are not relevant to the court's analysis and conclusion regarding plaintiff's submittals in this case.

[54]  As noted by defendant, plaintiff does not specifically argue that the Corps should have treated plaintiff's initial Environmental Protection Plan as an interim plan.  See Reply 14. However, based upon plaintiff's related contentions, the court finds that it is reasonable to infer that plaintiff is making this argument.

submitted plan, regardless of designation or quality, as an interim plan?; and (3) Is the government required to permit work under an interim plan for thirty days, or is the government only obligated to "consider" permitting work under an interim plan?  See id. at 1544 ("[I]f more than one meaning is reasonably consistent with the contract language it can not be deemed unambiguous.").  Given these ambiguities, the court is unable to determine that plaintiff's interpretation of the contract provision is unreasonable.

These ambiguities notwithstanding, it is a reasonable interpretation of the contract to require that a contractor make an effort to include in its interim plan, regardless of designation, the required elements of an acceptable Environmental Protection Plan.  This is not to say that all requirements must be satisfied to have a submitted Environmental Protection Plan be considered an interim Environmental Protection Plan.  However, a contractor should not be able to submit an otherwise blank sheet of paper entitled "Environmental Protection Plan" and claim that it met the requirements for an interim plan.  In this case, the Environmental Protection Plan was to include a list of state and local laws and regulations, a spill control plan, a recycling and waste minimization plan, a contaminant prevention plan, and a plan for environmental monitoring.  Def.'s App. 112-13.  It appears that plaintiff submitted a brief, five-sentence plan in an attempt to satisfy the contractual requirements.  Id. at 276.  Despite finding plaintiff's initial plan to be somewhat lacking, the court cannot determine, based on the record before it, whether plaintiff complied with its reasonable interpretation of the contract's requirement for an interim Environmental Protection Plan.  Thus, the court finds plaintiff's compliance with the contract regarding the Environmental Protection Plan to be a genuine issue.  But, as explained more fully below, the court finds the issue to be ultimately immaterial.

The court next considers the Quality Control Plan.  Plaintiff submitted a Quality Control Plan on July 11, 2000, id. at 278, over a month before the Corps issued the NTP.  The Corps rejected the Quality Control Plan on August 3, 2000, id., the same day it directed plaintiff to stop all work on the project, id. at 250; Pl.'s App. 59.  Although the record before the court lacks substantiating evidence, the court presumes that plaintiff resubmitted a Quality Control Plan, as the Corps accepted an addendum to such a plan on September 11, 2000.  Pl.'s App. 399.  The submission, rejection, and eventual approval all took place within the contractually acceptable time periods, and an acceptable plan was furnished within thirty days of the NTP.  Thus, the parties were in contract compliance.  The parties' main dispute about the Quality Control Plan concerns the following contractual provision: "The government will consider an interim plan for the first 90 days of operation."  Defendant again contends that plaintiff "never submitted any interim plans in accordance with the contract."  Renewed Mot. Summ. J. 5.  On the other hand, plaintiff again implies that the Corps should have treated plaintiff's initial Quality Control Plan

as an interim plan.[55]  Opp'n 13; Renewed Opp'n 19-20.  Thus, the court infers that plaintiff believes that it met the contract's requirement for a Quality Control Plan on July 11, 2000.

As with the interim Environmental Protection Plan, the contract contains no provisions explaining the workings of an interim Quality Control Plan beyond the previously quoted language.  And, the one sentence in the contract concerning the interim Quality Control Plan is full of the same ambiguities found in the sentence concerning the interim Environmental Protection Plan.  Thus, given these same ambiguities, the court cannot state that plaintiff's interpretation of the sentence is unreasonable.

However, once again, the court cannot, based on the record before it, determine whether plaintiff complied with its reasonable interpretation of the contract's requirement for an interim Quality Control Plan.  As with the Environmental Protection Plan, the court finds that it is appropriate to require that a contractor make an effort to include in its interim plan, regardless of designation, the required elements of an acceptable Quality Control Plan.  In this case, the Quality Control Plan was to include:

> a.  A description of the quality control organization, including a chart showing lines of authority and acknowledgment that the CQC staff shall implement the three phase control system for all aspects of the work specified. The staff shall include a CQC System Manager who may also be the project superintendent.

> b.  The name, qualifications (in resume format), duties, responsibilities, and authorities of each person assigned a CQC function.

> c.  A copy of the letter to the CQC System Manager signed by an authorized official of the firm which describes the responsibilities and delegates sufficient authorities to adequately perform the functions of the CQC System Manager, including authority to stop work which is not in compliance with the contract.  . . .

> d.  Procedures for scheduling, reviewing, certifying, and managing submittals . . . .

> . . . .

---

[55]  As noted by defendant, plaintiff does not specifically argue that the Corps should have treated plaintiff's initial Quality Control Plan as an interim plan.  See Reply 14.  However, based upon plaintiff's related contentions, the court finds that it is reasonable to infer that plaintiff is making this argument.

f. Procedures for tracking preparatory, initial, and follow-up control phases and control, verification, and acceptance tests including documentation.

g. Procedures for tracking construction deficiencies from identification through acceptable corrective action. . . .

h. Reporting procedures, including proposed reporting formats.

i. A list of the definable features of work.

Def.'s App. 119-20. It appears that plaintiff submitted a partially conforming plan, id. at 279-86, but the court cannot determine with the required precision whether plaintiff's plan would constitute an acceptable interim Quality Control Plan. As with the Environmental Protection Plan, the court finds plaintiff's contract compliance regarding the Quality Control Plan to be a genuine issue. However, as explained more fully below, the court ultimately finds the issue to be immaterial.

The next submittal that was required prior to the commencement of work was the Work Plan for the Disposal of Material. Plaintiff submitted a work plan on July 13, 2000, which the Corps rejected on August 3, 2000. Id. at 369A. The record does not contain any information concerning when plaintiff resubmitted the work plan or when the Corps accepted plaintiff's work plan. Thus, the court cannot determine whether this submittal contributed to any delay.

The fourth submittal required prior to plaintiff's commencement of dredging was the Operations Plan. Plaintiff submitted an Operations Plan on July 14, 2000, Def.'s Reply App. 20-21, about one month prior to the Corps' issuance of the NTP. The Corps rejected the Operations Plan on August 3, 2000, id. at 20, the same day it directed plaintiff to stop all work on the project, Pl.'s App. 59; Def.'s App. 250. Plaintiff resubmitted its Operations Plan on August 18, 2000. DPFUF ¶ 76. On August 29, 2000, the Corps approved the plan with a caveat that withheld permission from plaintiff to pursue certain simultaneous dredging. Def.'s App. 384. The submission, rejection, resubmission, and ultimate approval all took place within the contractually acceptable time periods. Accordingly, pursuant to the contract, plaintiff complied with the contractual requirement for an Operations Plan on August 29, 2000, about two weeks after the Corps issued the NTP.

The court next examines the three submittals that the contract implicitly required prior to plaintiff's commencement of work. Plaintiff submitted an Accident Prevention Plan on July 13, 2000, which the Corps rejected on August 2, 2000. DPFUF ¶ 55. Apparently, plaintiff twice resubmitted its Accident Prevention Plan–on August 25, 2000, and on September 11, 2000–and

the Corps finally accepted plaintiff's second resubmitted plan the same day it was proposed.[56] Def.'s App. 272.  Accordingly, it appears that plaintiff satisfied the requirement for an Accident Prevention Plan on September 11, 2000.

Despite the foregoing discussion concerning the Environmental Protection Plan, the Quality Control Plan, the Work Plan for Disposal of Materials, the Operations Plan, and the Accident Prevention Plan, the court finds that the events surrounding the predredging survey, including the remaining two submittals–the Qualifications of Hydrographic Surveying Firm and the Surveying Quality Control Plan, are determinative of whether the Corps delayed action on plaintiff's submittals in order to delay plaintiff's commencement of work.  The contract required that prior to beginning dredging in a particular area, plaintiff had to perform a hydrographic survey of that area.  Pl.'s App. 355.  Thus, at the June 23, 2000 postaward, preconstruction conference, plaintiff requested from the Corps a list of hydrographic surveyors, which the Corps provided in a June 27, 2000 letter.  DPFUF ¶¶ 27, 29, 60.  In the two-month period between contract award and the issuance of the NTP, plaintiff received at least four proposals from hydrographic surveyors.  Id. ¶ 59.  Plaintiff received a fifth proposal, from Woolpert, on August 22, 2000, id. ¶ 62, eight days after the Corps issued the NTP.  Plaintiff hired Woolpert on August 28, 2000, id., and provided the Corps with a Qualifications of Hydrographic Surveying Firm on August 30, 2000, Pl.'s App. 395, 397-98.  Two days later, on September 1, 2000, the Corps tentatively approved plaintiff's Qualifications of Hydrographic Surveying Firm, with certain comments and caveats.  Id. at 395.  The parties held a preparatory survey meeting on September 5, 2000, at which the Corps highlighted some problems with Woolpert's equipment and crew. DPFUF ¶ 64.  After a site visit by the Corps on September 6, 2000, Woolpert decided to cease its surveying efforts.  Def.'s App. 344.  Accordingly, plaintiff hired Michael Baker, which began surveying work on September 11, 2000.  DPFUF ¶ 65.  However, plaintiff did not submit the required Qualifications of Hydrographic Surveying Firm or Surveying Quality Control Plan until September 19, 2000, Pl.'s App. 404-05, eight days after Michael Baker had begun its surveys. Michael Baker completed the predredging survey on September 20, 2000.  DPFUF ¶ 65.  And, that same day, the Corps accepted plaintiff's Qualifications of Hydrographic Surveying Firm and rejected plaintiff's Surveying Quality Control Plan, conditioning both on Michael Baker's performance in the field.  Pl.'s App. 404-05.

The contract clearly required plaintiff to perform a hydrographic survey prior to commencing dredging operations.  For a reason not readily apparent in the record before the court, plaintiff did not hire a surveying firm until August 28, 2000, or two weeks after the Corps issued the NTP.  Thus, plaintiff cannot reasonably argue that the Corps caused any post-NTP

---

[56]  The record lacks most of plaintiff's actual Accident Prevention Plan submittals.  As noted previously, the dates are instead derived from a page of handwritten notes.  See Def.'s App. 272.

delay up until that date.[57]  Further, plaintiff cannot blame the Corps for the failure of its first surveying firm–Woolpert–to perform in an adequate manner.  Significantly, plaintiff's owner and president conceded that plaintiff's hydrographic surveyor-related problems were not the Corps' fault.  Def.'s App. 475.  Thus, the Corps cannot be charged with any delay from August 28, 2000, through September 6, 2000.  Finally, the five days taken by plaintiff to hire a new surveying firm and begin surveying was reasonably short, and was in no way the fault of the Corps.  Indeed, the Corps allowed the new surveying firm–Michael Baker–to begin its survey prior to receiving, much less accepting or rejecting, plaintiff's Qualifications of Hydrographic Surveying Firm and Surveying Quality Control Plan.  In sum, the court cannot ascribe any delay to the Corps for the time period between August 14, 2000, the date the Corps issued the NTP, and September 20, 2000, the date Michael Baker completed the predredging survey.

Plaintiff attempts to avoid this conclusion by alleging that it had submitted at least one copy of every required submittal by August 29, 2000, and as a result, any subsequent delay in its ability to begin dredging operations was the fault of the Corps.  Third Am. Compl. ¶¶ 43-46; see also Opp'n 15 ("GASA was prepared to work during July and August of 2000.").  However, even if plaintiff is correct in asserting that it had complied with the contract provisions concerning submittals as of August 29, 2000, plaintiff could not have begun dredging on that date as the predredging survey was not complete until September 20, 2000.  In fact, due to plaintiff's decision to retain Woolpert, a company that failed to adequately perform the predredging survey, the earliest plaintiff could have begun dredging operations was the day that it actually began dredging operations–September 21, 2000.  Thus, there is no genuine issue of material fact concerning whether the Corps caused any submittal-related delay between issuing the NTP and the commencement of plaintiff's dredging.  Clearly, it did not.

### 3. The Corps May Have Delayed Plaintiff's Prosecution of Work

Plaintiff's last allegation concerning delay is that the Corps breached the contract by impermissibly hindering and interfering with prosecution of its work once plaintiff had begun dredging operations.  Third Am. Compl. ¶ 66(c); see also Opp'n 15 ("[T]he Corps interfered with GASA's work causing further delay.").  Plaintiff identifies three specific examples of hindrance by the Corps.  First, plaintiff alleges that the Corps "forced work stoppages pending submittals and re-submittals of certain documents and plans."  Third Am. Compl. ¶ 48.  Second, plaintiff contends that the Corps improperly denied its requests to dredge in separate locations simultaneously.  Id. ¶ 50.  Third, plaintiff asserts that the Corps sought to modify the contract to replace some of the solid waste disposal with in-river placement.  Id. ¶¶ 51-53.

As an initial matter, defendant contends that plaintiff fails to supply any argument or factual support for its allegations and, as a result, plaintiff's allegations are "spurious."  Renewed Reply 5-6; see also Reply 16 n.6 (noting that plaintiff does not offer any "evidentiary support or

---

[57]  Plaintiff does not argue that it was required to wait to hire a hydrographic surveying firm due to the Corps' action or inaction on other submittals.

citation" for its contention that the Corps caused a delay by interfering with its work); Renewed Mot. Summ. J. 6 (noting that plaintiff "offers no factual support for its arguments"). Defendant's contention implies that plaintiff did not even attempt to meet its burden, which is not the case. Defendant, as the moving party, bears the initial burden of demonstrating the absence of any genuine issue of material fact, and may do so by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 323, 325. Then, the burden shifts to the nonmoving party, plaintiff, to demonstrate the existence of genuine issues of material fact with evidence beyond the pleadings. Id. at 324.

In its Renewed Motion for Summary Judgment, defendant recites plaintiff's allegations concerning delays occurring after the start of dredging operations and avers that "GASA offers no factual support for its arguments." Renewed Mot. Summ. J. 6. Thus, defendant has met its initial burden. Accordingly, the burden of persuasion shifts to plaintiff. In this case, despite defendant's contention to the contrary, plaintiff attempts to meet its burden primarily though its proposed findings of uncontroverted fact, which it derived from documents obtained through discovery.[58] Thus, the court will examine plaintiff's proposed findings of uncontroverted fact, and the documentary evidence cited in support of those proposed facts, to determine whether plaintiff has identified any genuine issues of material fact regarding whether the Corps delayed plaintiff's prosecution of its work and, if so, whether the delay was "for an unreasonable period of time." 48 C.F.R. § 52.242-14(b).

### a.  The Evidence Presented by Plaintiff Does Not Demonstrate Any Work Stoppages

Plaintiff's proposed findings of uncontroverted fact contain allegations that the Corps authorized work stoppages via two letters dated October 2, 2000, and a third letter dated October 24, 2000. PPFUF ¶¶ 79-85. The October 2, 2000 letters notified plaintiff that it was not in compliance with contractual provisions requiring the submission of daily survey Quality Control Reports and survey results. Pl.'s App. 99-100. Each of the October 2, 2000 letters contained the following sentence: "Please be advised that until such time that all of the proper documentation is being submitted as agreed upon, no dredging of regulated materials will be allowed to commence." Id. Defendant asserts that these two letters did not stop work on the Project, that plaintiff did not assert that it was in compliance with the cited contractual provisions, and that because plaintiff had not begun to dredge regulated material, the letters had no effect on current dredging operations. Def.'s Resp. ¶¶ 79-80.

---

[58]  Plaintiff's opposition to defendant's initial Motion for Summary Judgment does not describe any genuine issues of material fact related to work stoppages, simultaneous dredging, or the proposed switch to in-river placement. Plaintiff's opposition to defendant's Renewed Motion for Summary Judgment includes only three sentences concerning simultaneous dredging. Renewed Opp'n 24. Although it would have been helpful to the court and defendant for plaintiff to describe the genuine issues of material fact in its opposition briefs, rather than merely incorporating its proposed findings of uncontroverted fact by reference, id. at 1; Opp'n 1, there is no requirement that plaintiff actually do so.

Defendant is correct that the October 2, 2000 letters are not evidence of a work stoppage. Plaintiff does not identify any facts demonstrating that any work on the Project was stopped as a result of the letters. Indeed, to the contrary, there is evidence in the record indicating that plaintiff was engaged in dredging operations on, and immediately following, October 2, 2000. See, e.g., Def.'s App. 397 (indicating that plaintiff was continuously engaged in dredging operations from October 1, 2000, through October 31, 2000, with the exception of three Sundays). Thus, plaintiff fails to meet its burden to identify a material, disputed fact that the October 2, 2000 letters caused a delay.

The Corps' October 24, 2000 letter noted that the contract required plaintiff "to demonstrate [its] method of collecting and controlling water from the barges prior to beginning the regulated material dredging." Pl.'s App. 101. The letter then indicated that plaintiff's demonstration, which occurred from October 13, 2000, through October 20, 2000, was unsuccessful. Id. Accordingly, the letter informed plaintiff that it would not be permitted to begin dredging regulated material until it had conducted a successful demonstration, held an inspection, and furnished the Corps with various submittals. Id. at 102. Again, defendant asserts that this letter did not halt work on the Project, that plaintiff did not assert that it was in compliance with the cited contractual provisions, and that because plaintiff had not begun to dredge regulated material, the letter had no effect on current dredging operations. Def.'s Resp. ¶¶ 82-85.

Defendant is again correct that the October 24, 2000 letter is not evidence of a work stoppage. Similarly, plaintiff once again fails to identify any facts demonstrating that work on the Project was stopped as a result of the letter. Evidence in the record indicates that plaintiff was engaged in dredging operations on, and immediately following, October 24, 2000. See, e.g., Def.'s App. 397 (indicating that plaintiff was continuously engaged in dredging operations from October 1, 2000, through October 31, 2000, with the exception of three Sundays); id. at 399 (indicating that plaintiff was continuously engaged in dredging operations from November 1, 2000, through November 17, 2000, with the exception of some weekend days). Thus, plaintiff fails to meet its burden to demonstrate a material, disputed fact that the October 24, 2000 letter caused a delay.

Although the court cannot speculate as to what arguments may be lurking in the shadows of plaintiff's memoranda, the court will infer that, with respect to these three letters, plaintiff is contending that the Corps' letters prevented plaintiff from conducting dredging in the manner it desired, not all work contemplated by the contract. To the extent that this is an accurate reflection of plaintiff's argument, the court addresses the issue in the next section.

**b.  The Contract Did Not Permit Simultaneous Dredging**

Plaintiff contends that the Corps' refusal to permit simultaneous dredging of MU-3, MU-59, and MU-102 with the in-river placement area was "[a]n additional roadblock the Corps used to delay GASA from earning money . . . ." Renewed Opp'n 24. Plaintiff also provided proposed

findings of uncontroverted fact in support of this allegation.  See PPFUF ¶¶ 58-65.  More specifically, plaintiff contends that its bid was premised upon being able to dredge simultaneously, that its initial construction progress schedule and later Operations Plan envisioned simultaneous dredging, and that it requested the ability to dredge multiple areas simultaneously in correspondence with the Corps.  Id. ¶¶ 58-59, 61, 64.  Defendant's general response to plaintiff's proposed findings of fact is that the contract did not permit simultaneous dredging.  Def.'s Resp. ¶¶ 8, 60-61, 63, 65.

The contract identified each of the four areas to be dredged–i.e., MU-3, MU-59, MU-102, and the in-river placement area–as an "acceptance section."  Def.'s App. 144-45.  The contract also dictated the sequence of work:

> The Contractor shall determine the manner by which the work will be prosecuted, and in such order of precedence, as best suits the construction schedule, with the following restrictions.  Dredging operations shall proceed in the following order: 1) Removal of material designated for in-river placement, including demonstration of methods of controlling water from barges, followed by 2) Removal of material from Management Units MU-3, MU-59 and MU-102.  In general, dredging operations at any location shall begin at the upstream end and proceed in a downstream direction.  Dredging operations shall proceed within each acceptance section, . . . and all work within a particular acceptance section shall be completed and accepted before proceeding to the next acceptance section.

Id. at 144.  A plain reading of this contractual provision reflects that the contract did not contemplate simultaneous dredging.  Further, the evidence in the record indicates that the Corps adhered to these contract terms until it was satisfied that plaintiff could successfully engage in simultaneous dredging.

First, in a September 1, 2000 letter to the Corps, plaintiff indicated that its bid was based on its ability to pursue simultaneous dredging.  Pl.'s App. 106.  However, plaintiff fails to cite to any provisions from the solicitation that contemplated and permitted simultaneous dredging or to any evidence that the Corps accepted plaintiff's bid with the full knowledge that plaintiff intended to conduct simultaneous dredging.  Accordingly, plaintiff's argument must fail in this regard.

Next, plaintiff asserts that the Corps approved its proposal to conduct simultaneous dredging by failing to reject plaintiff's original construction progress schedule.  PPFUF ¶ 58.  As defendant notes, the Corps was not required to approve plaintiff's construction progress schedule.  See Def.'s Resp. ¶ 58; Def.'s App. 91.  Further, the Corps highlighted the discrepancy between plaintiff's construction progress schedule and the terms of the contract.  See Def.'s App. 193 ("Your schedule currently shows all of the work being performed at the same time which is not in contract compliance.").  Thus, the Corps' response to plaintiff's construction progress

schedule did not contradict the contract and approve simultaneous dredging. To the contrary, the Corps' initial response to plaintiff explicitly rejected the request for simultaneous dredging.

The Corps first became receptive to plaintiff's concept of simultaneous dredging in August 2000. On August 29, 2000, in response to plaintiff's August 18, 2000 Operations Plan, the Corps indicated: "We would entertain an option of simultaneous dredging of the clean fill and MU No. 59 or MU No. 3 if you can demonstrate your methods for dredging the MU material per contract spec." Id. at 385. Plaintiff pursued this option, and the required demonstration occurred from October 13, 2000, through October 20, 2000.[59] Pl.'s App. 101. However, as previously described, the demonstration was unsuccessful, preventing plaintiff from commencing simultaneous dredging. Id. at 101-02. The record is not entirely clear as to the precise date plaintiff was permitted to begin simultaneous dredging, but it appears that it may have been sometime between November 21, 2000, and December 31, 2000. See Def.'s Supp'l App. 125 (indicating that for the period from November 21, 2000, through December 31, 2000, plaintiff requested payment for dredging both the in-river placement area and MU-59); see also Pl.'s App. 110 (implying that plaintiff had not begun to engage in simultaneous dredging as of November 16, 2000). However, regardless of the exact date when plaintiff began simultaneous dredging, the record does not reflect that the Corps acted contrary to its representations to plaintiff. The Corps advised plaintiff that it would approve simultaneous dredging only in the event that plaintiff satisfied certain standards. It appears from the record that the Corps lived up to its end of the parties' understanding.

Altogether, despite any alleged ulterior motivations plaintiff ascribed to the Corps, the record reflects that the Corps acted in compliance with the terms of the contract and its own authoritative representations in considering plaintiff's request to pursue simultaneous dredging. Thus, plaintiff fails to raise any genuine issue of material fact that the Corps' actions or inactions with respect to simultaneous dredging delayed plaintiff's performance of the contract.[60]

### c. The Corps' Actions Relating to the Characterization of MU-102 May Have Caused a Delay

Plaintiff's proposed findings of uncontroverted fact contain allegations that the Corps delayed plaintiff's dredging of MU-102 with the proposal, issuance, and rescission of a change

---

[59] Plaintiff does not allege that the time period between August 29, 2000, and October 13, 2000, i.e., the time between the Corps' offer to consider simultaneous dredging and the necessary prerequisite test, constituted a delay attributable to the Corps.

[60] Among other averments, the Third Amended Complaint characterizes plaintiff's simultaneous dredging allegations as the Corps' failure to allow it to mitigate its damages. Third Am. Compl. ¶¶ 49-50, 55-56, 66(d). Because plaintiff's mitigation allegations merely restate its simultaneous dredging allegations, the court need not separately address defendant's alleged failure to permit mitigation.

order.  PPFUF ¶¶ 66-78.  Specifically, on November 13, 2000, the Corps requested from plaintiff a price proposal for changing MU-102 into an in-river placement area.  Id. ¶ 66.  Plaintiff contends that even after plaintiff informed the Corps that the proposed change would cost more, the Corps insisted on plaintiff's submission of a price proposal in a November 16, 2000 letter. Id. ¶¶ 67-68.  Plaintiff then indicates that it provided the Corps a price proposal on November 27, 2000, that reflected an increase in contract price, but that the Corps issued a unilateral contract modification on December 5, 2000, that reduced the contract price.  Id. ¶¶ 73-74.  Ultimately, the Corps rescinded the contract modification on December 22, 2000.  Id. ¶ 75.  In total, plaintiff alleges that the Corps delayed the dredging of MU-102 for 113 days.  Id. ¶ 77.  Defendant disagrees with plaintiff's contention that the Corps delayed plaintiff's dredging of MU-102, noting that plaintiff's support for such a delay comes solely from an expert report and that the contract prescribed the appropriate sequence of work.[61]  Def.'s Resp. ¶ 77.

---

[61]  With respect to plaintiff's submission of an expert report authored by Michel J. Sadaka in support of its opposition to defendant's Motion for Summary Judgment, defendant contends:

> Mr. Sadaka's report is insufficient evidence to support a factual assertion as Mr. Sadaka has no first hand knowledge of events that occurred on this project. Indeed, GASA offers no affidavits or declarations establishing that Mr. Sadaka has personal knowledge of the facts being asserted or that he is competent to testify as to facts asserted in GASA's response, or those relied upon by GASA. Mr. Sadaka's report likewise is not sworn or attested to under the penalty of perjury.

Reply 11 (citation omitted); see also Def.'s Resp. ¶ 77 (objecting to plaintiff's use of Mr. Sadaka's report); Renewed Mot. Summ. J. 2-3 (same).  Thus, defendant asserts that the expert report is (1) unsubstantiated and (2) unsworn.  First, the court is reluctant to consider unsubstantiated conclusions by an expert when determining the existence of any genuine issues of material fact.  If an expert does not cite the evidence in the record that backs up his or her statement, the court must treat the statement as mere speculation.  Second, it is a general rule that unsworn statements cannot be used in support of or in opposition to a motion for summary judgment.  See RCFC 56(e) (requiring that testamentary evidence provided in support of or in opposition to summary judgment to be in the form of affidavits, depositions, or answers to interrogatories); Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 n.17 (1970) (holding that an unsworn statement does not meet the requirements of Federal Rule of Civil Procedure 56(e)).  In some cases, courts have allowed a party to cure an unsworn statement.  A.A.B. Joint Venture v. United States, 77 Fed. Cl. 702, 706 (2007) (citing Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005) (suggesting that a party could have submitted affidavits to "cure" the unsworn letters submitted by the opposing party in support of its motion for summary judgment); Straus v. DVC Worldwide, Inc., 484 F. Supp. 2d 620, 634 (S.D. Tex. 2007) (finding that an "unsworn expert report did not constitute admissible summary judgment evidence" but was later cured by a subsequent sworn declaration); and Maytag Corp. v. Electrolux Home Prods., Inc., 448 F. Supp. 2d 1034, 1063-65 (N.D. Iowa 2006) (concluding "that subsequent verification or reaffirmation of

Plaintiff has raised, at a bare minimum, a genuine issue of material fact with respect to the existence of a delay related to the dredging of MU-102. Plaintiff cites evidence that the Corps requested a contract change concerning the dredging of MU-102 on November 13, 2000, but did not implement the change until December 5, 2000, and ultimately rescinded the change on December 22, 2000. This evidence could support an allegation that the Corps delayed the dredging of MU-102 for approximately thirty-nine days (i.e., November 13, 2000, through December 22, 2000). However, because it has already been established that the contract provided for a specific sequence of work, and that, at least until November 21, 2000, the Corps was requiring plaintiff to adhere to that sequence, any period of delay could not begin prior to November 21, 2000.[62] Thus, in sum, the record could support a delay of thirty-one days.[63]

On the other hand, the record contains numerous gaps that require supplementation to determine with certainty the existence and extent of any delay. For example, it appears that dredging in MU-102 did not begin until January 2001. Def.'s Supp'l App. 132 (indicating that plaintiff requested payment for dredging MU-102 in January 2001). But see Def.'s App. 351 (indicating that plaintiff began dredging in MU-102 on September 21, 2000). Further, the record

---

an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment")). However, in the instant case, although plaintiff had ample opportunity to address the unsworn nature of its expert's report, it did not do so, either in argument or by the submission of sworn testimony. See Renewed Opp'n 17 n.4 ("Mr. Sadaka's opinion is based upon the facts of record and as specifically referenced in, and attached to, his report. Thus, Mr. Sadaka's expert opinion is based on the facts of record creating a genuine issue of material fact, and is not mere speculation."). Thus, the court disregards any unsubstantiated factual allegations or conclusions in plaintiff's expert report at this stage of the proceedings.

[62] This conclusion seems to undercut plaintiff's claim of a 113-day delay.

[63] Further, the record contains evidence, in addition to the short period of time between the contract modification and the retraction of that modification, that raises questions about the Corps' motive for attempting to change the contract. Specifically, aside from two internal Corps e-mail messages, Pl.'s App. 117, 119, the record lacks evidence supporting the Corps' decision to reclassify regulated material as nonregulated material. The contract specifically dictated that the sediment removed from MU-102 must be disposed of in a permitted solid waste disposal facility. Def.'s App. 140. Yet, according to the record before the court, the Corps did not attempt to change this part of the contract, nor did the Corps provide plaintiff with any studies or other official documentation supporting the alteration of this contract provision. See Pl.'s App. 115 (reflecting plaintiff's view that the proposed modification was a "complete rewrite of the contract"). Thus, the Corps' proposal, issuance, and rescission of the change order directed at only some of the relevant portions of the contract lends credence to the suspicion that the Corps was only going through the motions of changing the contract, without any intention to make such a change.

lacks sufficient evidence specifically concerning whether dredging in MU-102 on November 13, 2000, was appropriate pursuant to the sequence of work provision of the contract or evidence of plaintiff's ability to begin dredging in MU-102 on November 13, 2000.  See, e.g., Pl.'s App. 115 (indicating plaintiff's position that it was "poised to commence dredging" of MU-102).  Evidence might exist that rebuts the existence of a delay, but defendant chose not to provide it, instead relying upon its general argument that plaintiff had not cited or provided evidence supporting such a delay.

Because the evidence regarding the existence and extent of the delay of plaintiff's dredging in MU-102 is incomplete, there is no need for the court to move on to the question of the reasonableness of any such delay.  However, plaintiff has shown a genuine issue of material fact concerning whether the Corps caused a delay by proposing, issuing, and rescinding a change order regarding MU-102.

## B.  Injury From Any Corps-Caused Delay

The court has found that there is a genuine issue of material fact concerning the reasonableness of the Corps' delay in issuing the NTP and as to the existence, extent, and reasonableness of any delay associated with plaintiff's dredging in MU-102.  Ultimately, however, defendant may still prevail on the overall delay claim if there is no genuine issue of material fact that plaintiff was not injured by the Corps' delay in issuing the NTP or alleged delay in allowing dredging in MU-102.  In order to show that it was harmed by the Corps' delay, plaintiff must show that it incurred additional expense due to the delay.  See John A. Johnson & Sons, Inc. v. United States, 180 Ct. Cl. 969 (1967) (per curiam) ("The issue is whether the defendant, for its own advantage and convenience in administering the project, has taken action which delayed the plaintiff[] . . . for an unreasonable length of time and thereby caused the plaintiff additional expense not due to the plaintiff's fault or negligence.").

In the Third Amended Complaint, plaintiff alleges that delays caused by the Corps forced it to work from January through April 2001, during which time it experienced weather-related delays,[64] Third Am. Compl. ¶¶ 57-59, and that but for the Corps-caused delays, it would not have needed to work on the Project during this time, id. ¶ 60.  Plaintiff also contends that the Corps-caused delays led it to incur $284,417.20 in direct costs, id. ¶ 67(a); prevented it from completing dredging of MU-102 and earning an additional $408,974.15, id. ¶¶ 63, 67(d); caused it to incur "extended field costs" in the amount of $1,018,998.09, id. ¶ 67(e); and led to the assessment of $15,591.42 in liquidated damages, id. ¶¶ 62, 67(f).

---

[64]  In fact, plaintiff contends that it "lost 31% of the available workdays due to inclement weather in this period of time."  Third Am. Compl. ¶ 59.  Plaintiff does not explain its calculation; however, the court assumes that plaintiff is including both the days lost that were contemplated by the contract and the days lost in excess of those contemplated by the contract.

Defendant argues that plaintiff cannot establish that any delay by the Corps caused plaintiff injury. Mot. Summ. J. 21; Renewed Mot. Summ. J. 6. Specifically, defendant points to plaintiff's September 14, 2000 Operations Plan, filed one month after the Corps issued the NTP, which indicated that plaintiff anticipated beginning work in mid-September and completing work in mid-December. Mot. Summ. J. 21; Reply 17. Defendant infers that plaintiff "recognized that the alleged delays through mid-September 2000 would not force GASA to work during the winter months (completing work by mid-December)."[65] Mot. Summ. J. 22; Reply 17. Defendant also argues that plaintiff failed, in the Third Amended Complaint, "to allege or demonstrate in any way how it actually was harmed by the issuance and prompt rescission" of the change order concerning MU-102. Renewed Mot. Summ. J. 6 n.3. Finally, defendant asserts that because plaintiff has already been paid $5,514,326.75 despite only incurring $4,807,793.44 in direct costs, any further recovery by plaintiff would amount to a windfall. Mot. Summ. J. 23; Renewed Mot. Summ. J. 17.

To determine whether there exists a genuine issue of material fact regarding any injury suffered by plaintiff as a result of the Corps' delays or alleged delays, the court is guided by the terms of the contract. The relevant contractual provisions indicate that plaintiff's performance was to be completed within 180 days of the NTP, Pl.'s App. 160; that no work could be performed on the river from April 15 through July 1, DPFUF ¶ 16; that twenty-five days of weather delay were contemplated from July through December, Def.'s App. 56; that twenty-six days of weather delay were contemplated from January through April, id.; and that the contract would be extended for any delay beyond that contemplated by the contract, id. Although the contract did not specify when the Corps was required to issue the NTP, the court held above that based upon the Corps' statements to plaintiff, the Corps should have issued the NTP within a reasonable time after July 12, 2000.

### 1. Plaintiff Cannot Recover Damages for Working During the Winter Months

Initially, plaintiff contends that the Corps' delays caused plaintiff to work during January, February, March, and April 2001, when it was faced with inclement weather. Plaintiff contends that working during the winter months is more costly than working during the rest of the year. Opp'n 17; see also Renewed Opp'n 24 (claiming that "river work during the winter months is more difficult due to shorter days, ice, and deeper and faster current"). Plaintiff's argument must fail. According to the plain language of the contract, it is clear that the Project could be affected by bad weather, and that the length of time for contract completion would be extended for any time exceeding the contract estimates. On its face, the contract appears to fully address the existence of and remedies for weather delays. If the weather was more severe than the contract

_____

[65] Specifically, defendant calculated, based on plaintiff's planned productivity, that plaintiff required only seventy work days to complete the Project. Mot. Summ. J. 22. Because plaintiff's Operations Plan allowed for eighty-three work days, defendant argued that plaintiff would complete work by the beginning of winter. Id.

contemplated, then plaintiff would be provided additional work days.  As noted above, plaintiff experienced adverse weather delays that exceeded the delays contemplated by the contract by ten days, and accordingly received a ten-day extension for contract completion.  DPFUF ¶ 83.  The contract does not appear to allow for any compensation for weather delays beyond what plaintiff already received.  Thus, to the extent that plaintiff is arguing that it was injured by Corps-caused delays that pushed work into January through April 2001, plaintiff's claim of injury lacks merit. Plaintiff has been compensated for such delays and is not entitled to double compensation.

## 2.  Plaintiff May Be Able to Recover Some Direct Costs

Plaintiff next asserts that the Corps' delay in issuing the NTP caused it to incur certain direct costs.  Defendant contends that plaintiff cannot recover direct costs because it has already received payment for these direct costs.[66]  Renewed Mot. Summ. J. 10-13.  Plaintiff presented its claim for $284,417.20 in direct costs to the contracting officer in its April 12, 2006 certified claim, indicating that "[t]he amount represents costs associated with motorized equipment, equipment subcontractors, consulting fees, other rental costs, legal fees, miscellaneous expenses, communication expenses, and gas and oil costs."  Third Am. Compl. Ex. E at 3; see also Pl.'s App. 72-73 (containing an itemization of all of these direct costs); id. at 24-25 (containing plaintiff's calculation of direct costs, which included all direct costs presented in the itemization minus costs for small tools and equipment).  In its May 16, 2000 clarification letter, plaintiff indicated that all of these direct costs were incurred between April 20, 2000, and August 14, 2000.  Third Am. Compl. Ex. E at 9.

Defendant argues that plaintiff has already been paid for most of these costs pursuant to the mobilization line item of the contract.  Renewed Mot. Summ. J. 11.  Specifically, defendant argues that the Corps paid plaintiff $150,000.00 in mobilization costs pursuant to Pay Estimate Number 1, $100,000.00 for mobilization and demobilization costs pursuant to Pay Estimate Number 9, and $21,511.36 in labor costs incurred prior to the commencement of dredging pursuant to Pay Estimate Number 2, for a grand total of $271,511.36.  Id. at 12.  Even more specifically, defendant notes that "[m]any" of the invoices first submitted with Pay Estimate Number 1, which was paid in full by the Corps, have been resubmitted in support of plaintiff's claim for direct costs related to the NTP delay, including the invoices of Tonomo Marine, Inc., McDonough Marine Service, and E & K Equipment, Inc.  Id. at 13.

First, plaintiff disputes defendant's contention that the Corps paid $21,511.36 for labor costs incurred prior to the commencement of dredging, noting that Pay Estimate Number 2 covered labor costs incurred by Massimo from September 1, 2000, to October 24, 2000.  Pl.'s Resp. ¶ 128.  Yet, the $21,511.36 line item for Massimo submitted as part of plaintiff's direct

---

[66]  Most of plaintiff's earnings on the contract were based on the quantity of work it performed.  See Def.'s App. 21.  Pursuant to the contract, plaintiff could only recover the following direct costs: $47,721.00 for the reimbursement of the payment and performance bonds and $250,000.00 for mobilization and demobilization costs.  Id.

cost allegation is dated July 31, 2000.  Pl.'s App. 72.  Thus, defendant's contention that plaintiff is seeking double payment of the $21,511.36 for labor costs lacks merit.

However, plaintiff does not refute defendant's contention that the Corps has already paid plaintiff $250,000.00 of the $284,417.20 in direct costs it now claims.  Because plaintiff fails to raise a genuine issue of material fact that it has not already been paid $250,000.00 of the $284,417.20 claimed, the court must presume that defendant is correct.  Thus, the court must focus only on the remaining $34,417.20 in direct costs claimed by plaintiff.  Defendant failed to advance a meritorious argument contesting plaintiff's ability to recover this sum as part of its delay damages.  Accordingly, genuine issues of material fact exist with respect to plaintiff's claim for $34,417.20 in direct costs.[67]  Thus, that claim survives defendant's motions.

### 3.  Plaintiff Cannot Recover Costs for Work It Did Not Perform

Plaintiff next contends that but for the Corps' delays, it would have completed the dredging of MU-102.  Construing all factual inferences in plaintiff's favor, Matsushita Elec. Ind. Co., 475 U.S. at 587, the court assumes a total Corps-caused delay of sixty-four days.  Defendant does not argue that plaintiff could not have completed dredging MU-102 if it had an additional sixty-four days within which to work.  However, defendant does contend that uncompleted work is not a compensable injury.  Renewed Mot. Summ. J. 14-15.  Specifically, defendant first asserts the logical proposition that plaintiff is prohibited from recovering the direct costs of work not performed.  Id. at 14 n.5.  Defendant then contends that plaintiff is prohibited from recovering lost profit.  Id. at 14-15.  For this second proposition, defendant cites Scott Timber Co. v. United States, 64 Fed. Cl. 130, 137-38 (2005) (quoting Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005) (emphasis added)):

> In order to be entitled to expectancy damages, which include lost profits, the plaintiff must satisfy three requirements.  First, the plaintiff must show that the lost profits were within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting.  La Van v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002), citing Restatement (Second) of Contracts § 351(1) (1981).

---

[67]  The court is not inclined to rule on the validity of any specific amount claimed by plaintiff as delay damages at this time, as the court has not yet concluded that delay damages are even available in this case.  However, the court notes that plaintiff eventually will need to explain how it is not precluded from recovering these remaining direct costs by the contractual provision prohibiting reimbursement for mobilization and demobilization costs beyond those specified in the relevant contract line item.  See Def.'s App. 51 (containing the contractual provision); id. at 21 (containing the line item that limits mobilization and demobilization costs to $250,000.00).  Plaintiff will also be required to explain how the NTP delay directly caused plaintiff to incur these direct costs.

Second, the plaintiff must establish that there would have been a profit but for the breach. Rumsfeld v. Applied Cos., 325 F.3d 1328, 1339 (Fed. Cir. 2003). Third, the measure of damages must be reasonably certain, although if "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004), quoting Locke v. United States, 151 Ct. Cl. 262, 283 F.2d 521, 524 (Ct. Cl. 1960).

Id. Defendant contends that because the Suspension of Work clause does not permit recovery for lost profit, recovery for lost profit was not in contemplation of the parties. Id. at 15. Plaintiff does not respond to defendant's argument, either by pointing to facts that would permit recovery for lost profit or by citing contrary case law. Thus, plaintiff has raised no genuine issue of material fact that it can be compensated for the dredging it did not complete in MU-102.

### 4. Plaintiff May Be Able to Recover Some Extended Field Costs

Fourth, plaintiff asserts that the Corps' delays caused it to incur extended field costs past December 2000. Plaintiff calculated its extended field costs by taking all of the costs incurred after December 30, 2000, and subtracting all amounts that represented items paid by the cubic yard.[68] Pl.'s App. 28. Defendant argues that "this calculation does not estimate any delay costs or additional costs, but rather is a total cost claim with subtractions for items that were paid by the cubic yard," a disfavored type of claim. Renewed Mot. Summ. J. 16. Defendant further argues that once again, plaintiff is seeking recovery of damages under the heading of "extended field costs" for which it has already received pursuant to the contract, i.e., that the direct costs incurred by plaintiff during this time period were incorporated in plaintiff's earnings based on the quantity of work performed. Id. at 16-17 (arguing that monthly payments to Massimo in January, February, March, April, and May 2001 were claimed as extended field costs but already paid for pursuant to plaintiff's January and February pay estimates). Defendant's argument is not substantiated by the evidence it presents. While plaintiff does claim payments made to Massimo in January, February, March, April, and May 2001 as part of its extended field costs claim, plaintiff's January and February pay estimates cover only January 1, 2001, through February 28, 2001. See Def.'s App. 133, 139. Thus, with respect to the other three months, defendant's argument fails.[69] Further, as noted above, the court is not prepared to rule on the validity of plaintiff's damages calculations at this stage of the proceedings, when the court has not even

---

[68] Essentially, these extended field costs are merely those direct costs incurred by plaintiff after December 30, 2000. There is no allegation that these extended field costs include any overhead costs.

[69] The record does contain plaintiff's certification of payment to Massimo for the period of May 1, 2001, through May 31, 2001, but the amount earned by Massimo–$21,821.54–does not correspond with the amount claimed by plaintiff in its extended field costs calculation–$14,219.23. See Def.'s Supp'l App. 153; Third Am. Compl. Ex. E at 28.

determined whether defendant is liable for such damages.  Thus, the court will continue its analysis in the abstract.

To determine whether plaintiff incurred extended field costs in 2001, the court separately examines the Corps' delay in issuing the NTP and the alleged delay associated with plaintiff's dredging in MU-102.  With respect to the NTP delay, regardless of whether the Corps' delay in issuing the NTP was unreasonable, the record demonstrates that the Corps did ultimately issue it on August 14, 2000.  DPFUF ¶ 49.  Thus, plaintiff was contractually obligated to complete work by February 10, 2001 (plus any time added for weather-related delays beyond those contemplated by the contract).  Accordingly, examining the NTP delay in isolation, plaintiff could only claim extended field costs as a result of the NTP delay up through approximately February 10, 2001.  With respect to the purported delay in dredging in MU-102, the court has previously found that plaintiff may be able to show that the Corps unreasonably delayed dredging in MU-102 for thirty-one days.  Accordingly, examining the purported delay in dredging MU-102 in isolation, plaintiff may be able to show that it incurred thirty-one days of extended field costs.  However, plaintiff's recovery as a result of this delay would be limited.  Plaintiff's contractually mandated completion date was approximately February 10, 2001.  Thus, plaintiff would only be able to recover, at most, extended field costs incurred for the thirty-one days following February 10, 2001, or until approximately March 13, 2001.

### 5.  Plaintiff May Be Able to Recover a Portion of the Assessed Liquidated Damages

Finally, plaintiff alleges that but for the Corps' delays, it would not have been assessed liquidated damages.  The Corps assessed plaintiff with fifty-four days of liquidated damages.  Id. ¶ 105.  According to the contract, liquidated damages are assessed "[i]f the Contractor fails to complete the work within the time specified in the contract, or any extension . . . ."  Def.'s App. 47.  Initially, plaintiff appears to argue that it could have completed work within the contractually mandated 180 days (plus any extensions for weather-related delays beyond those contemplated by the contract) had the Corps issued the NTP fifty-three days earlier than it did–i.e., on June 22, 2000.  See, e.g., Third Am. Compl. Ex. C at 1 (arguing that Corps-caused delays forced plaintiff to work in the winter months, which "made the contractual performance date an impossibility"); Opp'n 15 (contending that "the Corps clearly gave GASA the expectation in June of 2000, that the NTP was imminent").  However, the evidence before the court does not appear to support plaintiff's claim.  As previously noted, any delays due to working during months with adverse weather were fully addressed by the terms of the contract.  Thus, plaintiff has no basis to argue that adverse weather affected its ability to complete work within 180 days of the NTP. Additionally, the contractually mandated contract completion date was approximately February 10, 2001, and yet plaintiff was still not finished with work by April 15, 2001.  Even crediting plaintiff with ten days for weather-related delays in addition to the thirty-three days that the Corps delayed issuing the NTP, plaintiff still would have been working beyond the 180-day

contract limit.[70]  Thus, the NTP delay does not bear on liquidated damages.  On the other hand, because plaintiff may be able to show that the Corps delayed its dredging in MU-102 for thirty-one days, and that such a delay caused plaintiff to work beyond the 180-day period mandated by the contract, plaintiff may be able to show that its liquidated damages assessment should be reduced by thirty-one days.

In sum, plaintiff has established a genuine issue of material fact with respect to its alleged harm suffered as a result of the Corps' delay in issuing the NTP and alleged delay in allowing dredging in MU-102.  Specifically, plaintiff may be able to show that the NTP delay caused it to incur certain direct costs, that both delays caused it to incur extended field costs, and that the Corps alleged delay in allowing plaintiff to dredge in MU-102 caused an overassessment of liquidated damages.

## C.  Concurrent Delay Caused by Plaintiff

The court has found that there is a genuine issue of material fact as to the reasonableness of the delay of the Corps' issuance of the NTP, the existence, extent, and reasonableness of any delay associated with plaintiff's dredging in MU-102, and the harm suffered by plaintiff as a result of the Corps' delay in issuing the NTP and alleged delay in allowing dredging in MU-102.  However, defendant may still prevail on the overall delay claim if there is no genuine issue of material fact that plaintiff caused delay at the same time that it alleged the Corps to be delaying the NTP–from July 12, 2000, through August 14, 2000–or delaying dredging in MU-102–November 21, 2000, through December 22, 2000.  48 C.F.R. § 52.242-14(b); Essex Electro Eng'rs, Inc., 224 F.3d at 1292 ("A contractor cannot recover where the delays are concurrent or intertwined and the contractor has not met its burden of separating its delays from those chargeable to the Government."  (citation and quotation omitted)); Triax-Pac. v. Stone, 958 F.2d 351, 354 (Fed. Cir. 1992) ("[A] contractor is only entitled to recover under the Suspension clause when the government's actions are the sole proximate cause of the contractor's additional loss, and the contractor would not have been delayed for any other reason during that period."  (citing Merritt-Chapman & Scott Corp. v. United States, 528 F.2d 1392, 1397 (Ct. Cl. 1976))).

As noted above, the record before the court could support a delay in issuing the NTP of thirty-three days and a delay in the dredging of MU-102 of thirty-one days, and that, as a result, plaintiff may be entitled to recover certain direct costs, extended field costs, and assessed liquidated damages.  As also noted above, the two relevant delay periods spanned from July 12,

---

[70]  Specifically, the period from February 10, 2001, to April 15, 2001, is sixty-four days. Subtracting ten days for weather-related delays reduces the total to fifty-four days.  Then, subtracting thirty-three days for the NTP delay leaves twenty-one days.  These twenty-one days represent the number of days beyond the 180-day contract requirement that plaintiff was still actually working, even considering the NTP delay.  And, because plaintiff did not complete work prior to the April 15, 2001 cut-off date, it is reasonable to assume that the twenty-one days could have been greater.

2000, through August 14, 2000, and from November 21, 2000, through December 22, 2000. Thus, the court must determine whether defendant, as the moving party, presented evidence that plaintiff caused a delay during these time periods, and, if so, whether plaintiff presented evidence that it did not cause a delay during these time periods.  Celotex Corp., 477 U.S. at 323-24.

With respect to the first time period at issue, defendant contends that plaintiff failed to complete the submittal process prior to the Corps' issuance of the NTP, as it represented it would in its construction progress schedule.  Mot. Summ. J. 12-14, 18-19; Reply 15-17.  Defendant's argument lacks merit on three fronts.  First, as noted above, the contract required only one submittal prior to the Corps' issuance of the NTP–the Propelling Unit Agreement.  Because plaintiff submitted a Propelling Unit Agreement on July 12, 2000, plaintiff satisfied the contractual requirement for submittals prior to receiving the NTP.  Second, as found above, plaintiff could not be bound by its initial construction progress schedule because the schedule was based on Corps-provided assumptions (e.g., an imminently-issued NTP) that turned out to be false.  Third, at no time prior to issuing the NTP did the Corps indicate to plaintiff that the NTP was delayed because of plaintiff's submittals or lack thereof.  See PPFUF ¶ 52 (noting that at no time prior to the Corps' January 12, 2001 letter did the Corps claim that plaintiff caused or contributed to the delay in issuing the NTP).  Because defendant has failed to identify any other potential delay caused by plaintiff between the date it accepted plaintiff's payment and performance bonds and the date the Corps issued the NTP, plaintiff is not required to present evidence that it did not cause a concurrent delay during this period.

With respect to the second time period at issue, defendant fails to generally disclaim any genuine issue of material fact relating to any delay caused by plaintiff concurrent with the alleged delay in dredging MU-102, or to identify any action or inaction by plaintiff from November 21, 2000, through December 22, 2000, that caused delay in the prosecution of work under the contract.  Defendant's sole allegations of concurrent delay concern plaintiff's submittals during the period of time prior to plaintiff's commencement of dredging in September 2000.  See Mot. Summ. J. 12-14, 18-21; Reply 12-15; Renewed Mot. Summ. J. 5-6; Renewed Reply 4-5.  Thus, defendant has not met its initial burden to demonstrate a genuine issue of material fact with respect to any delay caused by plaintiff concurrent with the alleged delay in dredging MU-102. See Celotex Corp., 477 U.S. at 323.  Accordingly, the burden does not shift to plaintiff and, as a result, a genuine issue of material fact exists as to concurrent delay during this time period.[71] Thus, in sum, plaintiff has established genuine issues of material fact on its delay claim.

---

[71]  The court's findings regarding concurrent delay do not prevent defendant from later identifying concurrent delay caused by plaintiff or from arguing or attempting to prove that plaintiff caused other, nonconcurrent delay that might counteract or obviate any damages that plaintiff might be entitled to for any Corps-caused delay.

## IV.  IN-RIVER PLACEMENT

Plaintiff contends that the Corps failed to provide it compensation "for the disposal of solid waste encountered during the in-river dredging operation" and for the placement of material in the in-river placement area.  Third Am. Compl. ¶¶ 61, 66(e); Third Am. Compl. Ex. E at 3. Defendant contends that the Corps properly compensated plaintiff for both the disposal of solid waste and the in-river placement of material.  Mot. Summ. J. 26-29; Renewed Mot. Summ. J. 7-9.  The court addresses each of plaintiff's contentions in turn.

### A.  The Contract Required Plaintiff to Dispose of All Solid Waste at a Permitted Solid Waste Disposal Facility

According to plaintiff:

> GAS[A] incurred costs associated with the [disposal] of solid wastes during the in-river dredging operation.  Specifically, GASA encountered solid waste that was not deemed suitable by the COE for use[ a]s in river fill.  GASA was directed to [dispose] of it during dredging as solid waste.  Pursuant thereto, GASA followed the COE directives and [disposed] of the rubble at a solid waste facility and was not reimbursed for these costs.

Third Am. Compl. Ex. E at 3.  Defendant counters that "[t]he contract clearly and unambiguously provided that all solid waste recovered from dredging operations was to be extracted from the dredged material, set aside, and disposed of at [a] permitted solid waste disposal facility." Renewed Mot. Summ. J. 7.  Thus, the court turns to the contract.

The contract alerted plaintiff to the type of material it would encounter during the Project: "The material to be dredged is primarily sand and gravel combined with silt and clay, and includes rubble, logs and timbers, tires and other rubber products, scrap metal items, railroad ties, wires, large chunks of concrete, boulders, and other non-floatable debris and discarded solid materials."  Def.'s App. 130.  In the same paragraph, the contract indicated how plaintiff was to dispose of the material from each of the four areas of the river: material dredged from the in-river placement area was to be disposed of pursuant to the paragraph titled "IN-RIVER PLACEMENT OF DREDGED MATERIALS" and material dredged from MU-3, MU-59, and MU-102 was to be disposed of pursuant to the paragraph titled "MATERIAL TO BE DISPOSED OF AT A PERMITTED SOLID WASTE DISPOSAL FACILITY."  Id.  However, the same paragraph also indicated that "[s]olid wastes recovered from the dredging operations from any area" were to be disposed of pursuant to the paragraph titled "DISPOSAL OF SOLID WASTES."  Id. (emphasis added).

-64-

The paragraph titled "DISPOSAL OF SOLID WASTES" defined solid waste as:

> rubbish, waste materials, garbage, rubble, logs and timbers, tires and other rubber products, scrap metal items, and other non-floatable debris and discarded solid materials, including man-made items such as wire, railroad ties, large chunks of concrete, appliances, or other refuse . . . , larger than 24-inches in size, that are visibly present [in] the material dredged from the project site.

Id.  According to this paragraph, visible solid waste was to be "extracted from the dredged materials and set aside for disposal as a solid waste[,] . . . placed in containers . . . [,] and disposed of in a permitted solid waste disposal facility permitted to receive the particular material."  Id.  Further, the paragraph indicated that "[n]o separate payment will be made for disposal of solid wastes, and all such work shall be considered incidental to the work."  Id.

Plaintiff's contention that it was not required to specially dispose of solid waste dredged from the in-river placement area, as well as its claim for additional compensation for such disposal, appears to based on the contract provision requiring that material dredged from the in-river placement area should be disposed of pursuant to the contract paragraph titled "IN-RIVER PLACEMENT OF DREDGED MATERIALS."  See Pl.'s App. 144.  However, it is clear from reading the entire paragraph of the contract that contains these requirements that any solid waste encountered in any area of the river was to be disposed of at a permitted solid waste disposal facility at no additional cost to the Corps.  The contract contains no ambiguity.  Thus, there is no genuine issue of material fact that the Corps properly required plaintiff to specially dispose of solid waste and that the Corps properly compensated plaintiff for such disposal.

### B. The Corps Properly Compensated Plaintiff for the Placement of Material in the In-River Placement Area

Plaintiff contends that the Corps "failed to pay GASA for the placement of [dredged] materials in-river . . . ."  Third Am. Compl. Ex. E at 3.  Specifically, plaintiff contends that because it was compensated for dredging 60,312 cubic yards of material from the in-river placement area, it should be similarly compensated for the placement of 60,312 cubic yards of dredged material, and not merely for the 49,102 cubic yards claimed by the Corps.  Id.; PPFUF ¶ 112.  Defendant responds that the Corps only paid for the material "properly placed in the designated area," as indicated by "underwater surveys," pursuant to the terms of the contract.  Def.'s Resp. ¶ 112.  Thus, once again, the court refers to the contract.

The contract contained an entire section addressing payment for dredging, disposal, and in-river placement titled "MEASUREMENT AND PAYMENT."  Def.'s App. 86-89.  One paragraph in this section indicated that "[p]ayment for the dredging" of MU-3, MU-59, MU-102, and the in-river placement area was to be "made on the basis of cubic yards of actual materials dredged."  Id. at 87.  The contract explained how the dredged material would be measured:

The total amount of material removed and to be paid for will be measured by the cubic yard in place.  Measurement of the number of cubic yards in place will be made by computing the volume between the bottom surface shown by soundings from the before-dredging survey, and the bottom surface shown by sounding surveys made as soon as practicable after the work has been completed . . . .  The volume for measurement will include the material within the limits described in . . . [the] paragraph "DREDGING TOLERANCES", less any deductions that may be required for misplaced material.

Id. at 87-88.  Similarly, "[p]ayment for the disposal" of material dredged from MU-3, MU-59, MU-102, and the in-river placement area was to be "made on the basis of cubic yards of actual materials disposed."  Id. at 88.  The measurement of disposed material was explained as follows: "The total amount of material removed and to be paid under the contract will be measured by the cubic yards of material dredged as specified above" (the "disposal measurement provision").  Id.

In addition, the contract contained other provisions that bore on the disposal of material in the in-river placement area.  In the section titled "DISPOSAL OF MATERIALS," the contract provided: "Dredged materials which are designated for in-river placement shall be placed in the fill areas shown.  The material shall be confined within the limits of the fill areas. . . .  No free fall of the material through the water column will be permitted."  Id. at 131.  Further, as specified in the section of the contract titled "DREDGING," plaintiff was cautioned: "Any material deposited in places other than those specified in . . . [the] DISPOSAL OF MATERIALS [section], designated on the drawings or otherwise directed by the Contracting Officer, or which escapes from such places, will not be paid for."  Id. at 142.

Plaintiff's contention that it should be compensated for disposing of all 60,312 cubic yards of the material it dredged is based upon its interpretation of the disposal measurement provision.  Opp'n 23.  Plaintiff argues that because the disposal measurement provision is more specific than the provision preventing payment for material deposited outside of the designated areas, the disposal measurement provision controls.  Id.  Defendant contends that plaintiff's interpretation of the contract is unreasonable because "it would read out of the contract terms expressly specifying that the contractor is not paid for materials placed outside the placement area."  Mot. Summ. J. 27.

The disposal measurement provision is, at best, awkwardly worded.  Taken in isolation, it is reasonable to interpret the provision as equating the volume of disposed material with the volume of dredged material.  However, "[w]hen interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."  NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004).  Not only does the contract expressly prohibit compensation for material placed outside of designated areas in the DREDGING section, but it also implies such a prohibition within the MEASUREMENT AND PAYMENT section.  In fact, the paragraph explaining the measurement of dredged materials, referred to in the disposal measurement provision, provides that deductions for

misplaced material will be subtracted from the "volume for measurement."  Thus, all of the contractual provisions can be reasonably read together to provide that only the material that was properly dredged and properly placed would be measured to compute the compensable volume. The court sees no ambiguities.  Further, plaintiff has provided no evidence to dispute defendant's contention that plaintiff only properly placed 49,102 cubic yards in the in-river placement area. Plaintiff merely indicates that it "did not agree with the Corps' quantities," without citing any evidence reflecting the correct quantities.  See Pl.'s Resp. ¶ 102; c.f. Opp'n 24 (arguing that there is no evidence that "the material not paid for was an obstruction to navigation or damages any other facilities or structures").  Thus, there is no genuine issue of material fact that plaintiff was properly compensated for the placement of material in the in-river placement area.

## V.  CONCLUSION

Because the court has found that there exist genuine issues of material fact for trial with respect to plaintiff's delay claim, the court **DENIES IN PART** Defendant's Motion for Summary Judgment and Defendant's Renewed Motion for Summary Judgment.  However, with respect to plaintiff's in-river placement claims, the court **GRANTS IN PART** Defendant's Motion for Summary Judgment and Defendant's Renewed Motion for Summary Judgment.

Defendant is directed to file an answer to plaintiff's Third Amended Complaint **no later than Tuesday, January 15, 2008**.

The parties shall then, **by no later than Tuesday, January 22, 2008**, file a joint status report proposing further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge