# In the United States Court of Federal Claims

No. 01-642 C
(Filed: August 20, 2009)

```
*************************************
GASA, INC.,                         *
                                    *
              Plaintiff,            *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
              Defendant.            *
*************************************
```

### RULING ON DEFENDANT'S MOTION IN LIMINE

In June 2000, plaintiff GASA, Inc. contracted with the United States Army Corps of Engineers ("Corps") to dredge certain areas of the Monongahela River. As a result of difficulties encountered by the parties during the contract performance period, this lawsuit ensued, with plaintiff seeking delay damages, compensation for the dredging and placement of certain river material, and the return of withheld liquidated damages. The court narrowed the amount and types of damages recoverable by plaintiff in ruling on defendant's two motions for summary judgment. Now, in the motion in limine presently before the court, defendant seeks to exclude the expert report and testimony of Michel J. Sadaka, plaintiff's expert on construction delays, pursuant to Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). For the reasons set forth below, the court denies defendant's motion.

### I. BACKGROUND[1]

On March 20, 2000, the Corps' Pittsburgh District issued a sealed bid solicitation for the dredging of Braddock Locks and Dam Pool 3 Navigation Channel in the Monongahela River ("the Project"). The Project consisted of dredging the river, disposal of some of the dredged material at an approved, off-site landfill, and placement of the remaining dredged material back in the river at a different location ("in-river placement"). The solicitation specifically identified four areas of the river to be dredged–referred to as MU-3, MU-59, MU-102, and the in-river placement area–as well as the cubic yards of material associated with each area. Only the material dredged from the in-river placement area was to be placed back in the river; the remaining material was to be disposed off-site. The solicitation indicated that most of the contract earnings would be based on the quantity of material dredged and disposed of, except for

---

[1] This section contains only a brief synopsis of the relevant facts and procedural history.

the reimbursement for payment and performance bonds and the costs of mobilization and demobilization. The solicitation also indicated that contract performance was to begin within ten days of the Notice to Proceed ("NTP") and completed within 180 days of the NTP. On June 6, 2000, plaintiff was awarded the contract in the amount of $6,410,559.55.

Almost every stage of contract performance was delayed in some manner for various reasons. The NTP was not issued until August 14, 2000, more than two months after the award of the contract. Plaintiff did not begin dredging operations until September 21, 2000, exceeding the ten-day post-NTP deadline provided for in the contract. And, dredging continued past February 10, 2001, the 180-day contract deadline for completing performance. Due to a contract provision prohibiting dredging after April 15 of any given year, plaintiff's last day of dredging was April 11, 2001, even though the full amount of work contemplated by the contract had not been completed.

Plaintiff filed the instant suit on November 14, 2001, subsequently amending its complaint on three occasions. In its Third Amended Complaint, plaintiff sought total damages of $1,906,718.43 plus interest, an amount that encompassed the return of $15,591.42 in assessed liquidated damages, compensation related to the in-river placement of dredged material in the amount of $178,737.57, and delay-related damages of $1,712,389.44. Plaintiff specified four ways in which the Corps caused its delay-related damages: the Corps delayed the issuance of the NTP; delayed the start of plaintiff's work until September 21, 2000; hindered and interfered with plaintiff's prosecution of the work; and prohibited plaintiff from mitigating the Corps-caused delays. In addition, plaintiff broke down its delay-related damages into three distinct elements. First, plaintiff contended that between April 20, 2000, and August 14, 2000, it incurred direct costs of $284,417.20 related to the Corps' delay in issuing the NTP. Second, plaintiff claimed damages of $408,974.15 for work that it was unable to complete before the contract-mandated stoppage date of April 15, 2001, due to the alleged delaying actions of the Corps. Id. Third, plaintiff sought compensation in the amount of $1,018,998.09 for its extended field costs, encountered from December 31, 2000, through April 15, 2001, which resulted from the alleged delaying actions of the Corps.

The court ruled on defendant's motions for summary judgment in a November 28, 2007 Opinion and Order, and concluded:

> [T]here is a genuine issue of material fact as to the reasonableness of the delay of the Corps' issuance of the NTP, the existence, extent, and reasonableness of any delay associated with plaintiff's dredging in MU-102,[2] and the harm suffered by

---

[2] The court concluded that a genuine issue of material fact existed concerning whether there was a Corps-caused delay in plaintiff's dredging of MU-102 that persisted from November 21, 2000, through December 22, 2000, or thirty-one days. GASA, Inc. v. United States, 79 Fed. Cl. 325, 362-63 (2007).

> plaintiff as a result of the Corps' delay in issuing the NTP and alleged delay in allowing dredging in MU-102.

GASA, Inc., 79 Fed. Cl. at 368 (footnote added). Consequently, the court limited the damages potentially recoverable by plaintiff to some direct costs associated with the NTP delay, extended field costs associated with the alleged delay of plaintiff's dredging in MU-102, and some liquidated damages. See id. at 347-71. In particular, the court determined that there were genuine issues of material fact concerning $34,417.20 of the direct costs, id. at 365-66, the extended field costs incurred during the thirty-one days following the contract completion date of February 10, 2001, id. at 367, and whether the liquidated damages should be reduced by an amount equivalent to thirty-one days, id. at 368. Subsequent to the court's decision, defendant filed the instant motion, which has been fully briefed by the parties. Having determined that oral argument is unnecessary, the court is prepared to rule.

## II. DISCUSSION

### A. Motions In Limine

Rule 16 of the Rules of the United States Court of Federal Claims ("RCFC") empowers the court to, prior to trial, rule "on the admissibility of evidence" and limit "the use of testimony under Federal Rule of Evidence 702." RCFC 16(c)(2)(C)-(D). A motion in limine is one of the means by which a party can obtain such a ruling. Such a motion "prevent[s] a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters" and "enables a court to . . . expedite and render efficient a subsequent trial." Baskett v. United States, 2 Cl. Ct. 356, 367-68 (1983); see also id. at 368 (noting that the granting of a motion in limine does not preclude the parties from receiving a fair trial). The party offering the evidence that is the subject of the motion in limine must demonstrate its admissibility by a preponderance of evidence. Bourjaily v. United States, 483 U.S. 171, 175-76 (1987) (concluding that "admissibility determinations that hinge on preliminary factual questions" under Federal Rule of Evidence 104(a) are to "be established by a preponderance of proof").

### B. Admissibility of Expert Testimony

Pursuant to the RCFC, parties utilizing expert testimony are required to submit a written report from the expert during discovery that must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the data or other information considered by the witness in forming" his or her opinions. RCFC 26(a)(2)(B). However, to be admissible as evidence at trial, the expert testimony must be both relevant and reliable. Daubert, 509 U.S. at 589; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999).

The relevancy requirement is described in Federal Rule of Evidence 402, which broadly states that "[a]ll relevant evidence is admissible" unless otherwise provided in the rules or

elsewhere. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; see also Fed. R. Evid. 702 (requiring scientific evidence to "assist the trier of fact to understand the evidence or to determine a fact in issue"). The reliability requirement appears in Federal Rule of Evidence 702, which governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, when a party proffers expert testimony, the "the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific[, technical, or other specialized] knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592 (footnote omitted); see also Kumho Tire Co., 526 U.S. at 149 (applying "Daubert's general principles" to all "expert matters described in Rule 702"). See generally Fed. R. Evid. 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . ."). The trial judge accomplishes this task by making "a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93.

In Daubert, the United States Supreme Court set forth a number of factors that a trial judge might consider when assessing the reliability of expert testimony under Federal Rule of Evidence 702: (1) whether the theory or technique "can be (and has been) tested," id. at 593; (2) "whether the theory or technique has been subjected to peer review and publication," id.; (3) "the known or potential rate of error," id. at 594; and (4) whether the theory or technique has been generally accepted by the relevant community, id. These factors are neither mandatory nor exhaustive. Id. at 593; see also Kumho Tire Co., 526 U.S. at 152 (indicating the importance of a testifying expert who "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (providing that a trial judge is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert" and that the judge "may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) (noting that a "significant" factor to consider "is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"). Rather, "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." Daubert, 509 U.S. at 594. Thus,

"whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho Tire Co., 526 U.S. at 153.

### C. Mr. Sadaka's Expert Report and Testimony May Be Offered at Trial

In the instant case, defendant seeks to exclude the expert report and testimony of plaintiff's delay expert, Mr. Sadaka, as inadmissible under Federal Rule of Evidence 702 and Daubert. In his expert report, Mr. Sadaka identified "four distinct periods" relating to the solicitation and execution of the contract at issue and evaluated those periods "in terms of delays incurred, effect of the delays, and the liability resulting from such delays." Def.'s Mot. in Limine Ex. ("Def.'s Ex.") 1 at 8. The four identified periods were: (1) plaintiff's submission of a proposal to the Corps' issuance of the NTP (April 20, 2000, to August 14, 2000); (2) the Corps' issuance of the NTP to plaintiff's commencement of dredging operations (August 14, 2000, to September 20, 2000); (3) plaintiff's commencement of dredging operations to plaintiff's "'impacted planned' completion date" (September 21, 2000, to December 30, 2000); and (4) plaintiff's "'impacted planned' completion date" to the "drop dead" date for dredging operations (December 31, 2000, to April 15, 2001). Id. For each of the four periods, Mr. Sadaka opined on the existence of a delay, who was responsible for the delay, and whether injury resulted from the delay, and described the evidence he relied upon in support of his opinions. Id. at 9-17 (first period), 17-19 (second period), 20-23 (third period), 23 (fourth period). Mr. Sadaka then determined the amount of damages purportedly due to plaintiff based on his delay analysis. Id. at 24-28.

As noted above, issues remaining for trial include: (1) the reasonableness of the delay of the Corps' issuance of the NTP; (2) the existence, extent, and reasonableness of any delay associated with plaintiff's dredging in MU-102; and (3) the harm suffered by plaintiff as a result of the Corps' delay in issuing the NTP and alleged delay in allowing dredging in MU-102. Defendant's objections to Mr. Sadaka's report concern the latter two issues and fall into three categories. First, defendant argues that Mr. Sadaka does not appropriately address the harm suffered by plaintiff as a result of the Corps' delay in issuing the NTP. Second, defendant contends that Mr. Sadaka does not properly analyze the existence of a Corps-caused delay in allowing dredging in MU-102. Third, defendant contends that Mr. Sadaka does not appropriately address the harm suffered by plaintiff as a result of the Corps' alleged delay in allowing dredging in MU-102. The court addresses each objection in turn.

#### 1. Damages Related to the NTP Delay

Defendant first argues that Mr. Sadaka does not appropriately address the harm suffered by plaintiff as a result of the Corps' delay in issuing the NTP because he "fails to provide any analysis or evidence that [plaintiff] incurred any extra or additional cost due to the NTP delay" and "fails to answer the obvious question of whether [plaintiff], in fact, has already been paid for the costs it now seeks." Def.'s Mot. in Limine ("Mot.") 7. More broadly, defendant contends

that Mr. Sadaka's "methodology for calculating damages is either non-existent or makes no sense." Def.'s Reply Supp. Its Mot. in Limine ("Reply") 3 n.2. Plaintiff, after describing the relevant portions of Mr. Sadaka's expert report, deposition, and deposition exhibits, remarks that Mr. Sadaka is qualified to render opinions regarding the NTP delay, discussed the issues raised by defendant in his report and at deposition, and opined on a topic familiar to the United States Court of Federal Claims–construction delay damages. Pl.'s Resp. Def.'s Mot. in Limine ("Resp.") 9.

In his expert report, Mr. Sadaka, after attributing the NTP delay to defendant, indicates that plaintiff "quantified the direct cost of the NTP delay" as $317,224.99, described an attached exhibit containing plaintiff's quantification, and calculated revised direct costs of $284,417.20. Def.'s Ex. 1 at 13, 24-25. Moreover, at deposition, Mr. Sadaka explained that his revised amount reflected those direct costs that plaintiff sustained above and beyond the costs allowed for by the contract. Def.'s Ex. 2 at 76-77, 92-93. Mr. Sadaka also produced a spreadsheet at deposition itemizing the direct costs incurred on the Project sorted by date. Pl.'s Resp. Def.'s Mot. in Limine Ex. ("Pl.'s Ex.") A at 7-14;[3] Pl.'s Ex. B at 78-81. He explained that he calculated his revised amount of direct costs by summing the costs incurred prior to August 14, 2000, and subtracting amounts that did not reflect mobilization costs. Pl.'s Ex. B at 78. There is no indication that Mr. Sadaka accounted for the $250,000 cap on mobilization and demobilization costs contained in the contract.

Given this evidence, the court disagrees with defendant that Mr. Sadaka failed to provide analysis related to the NTP delay and the resulting damages. Nor does the court agree that Mr. Sadaka failed address whether plaintiff had already been paid for the direct costs it now seeks. However, these findings do not mean that the court intends to credit this testimony. At trial, plaintiff's counsel must lay the foundation for Mr. Sadaka's testimony. Then, on cross-examination, defense counsel will, undoubtedly, highlight any weaknesses or errors in that testimony. Thus, the weight that the court should ascribe Mr. Sadaka's analysis and opinion is a matter that remains open. Similarly, defendant's attack on Mr. Sadaka's methodology is best left for cross-examination. Mr. Sadaka arrived at his revised direct costs figure by performing a simple mathematical calculation on the costs that he believed were relevant. His method of calculation–the mere adding of a column of figures–is hardly controversial and is sufficiently reliable for the purposes of determining admissibility. Cf. Murfam Farms, LLC, by & Through Murphy v. United States, Nos. 06-245T et al., 2008 WL 4725468, *4 (Fed. Cl. Sept. 19, 2008) ("Dr. Chance's discussion of profit possibilities for publicly traded and non-publicly traded options appears to be nothing more than a simple comparison, to which the Daubert factors provide little assistance."). Whether Mr. Sadaka summed the correct amounts, or properly excluded the $250,000 contractual cap on mobilization and demobilization costs that reduced the amount of direct costs recoverable by plaintiff, go to the weight that the court will accord his testimony. Thus, the court denies defendant's motion with respect to NTP delay damages.

---

[3] Plaintiff did not paginate Exhibit A. Thus, the court uses the page numbers assigned by the court's electronic filing system for citation purposes.

### 2. Existence of a Corps-Caused Delay in Allowing Dredging in MU-102

Defendant next contends that Mr. Sadaka does not properly analyze the existence of a Corps-caused delay in allowing dredging in MU-102 because he "fails to establish any cause and effect relationship between actions of the Corps and any alleged delay to [plaintiff]." Mot. 8. Plaintiff responds that Mr. Sadaka adequately addresses the existence of a delay in his expert report. Resp. 10-11. As noted by plaintiff, Mr. Sadaka describes in his expert report the evidence related to the delay in dredging MU-102, including the Corps' request for a contract change proposal, the Corps' issuance of a contract change, and the Corps' rescission of the contract change. Def.'s Ex. 1 at 21-22. He then explains that the Corps' actions constituted a delay. Id. at 22-23.

The opinion expressed by Mr. Sadaka in his expert report concerning the purported Corps-caused delay in plaintiff's dredging of MU-102 is relevant to the court's inquiry and is supported by some analysis. Indeed, it is, pursuant to Federal Rule of Evidence 702, based on adequate facts, the product of reliable reasoning (i.e., government actions can result in construction delays), and represents a reliable application of his reasoning to facts of the case. To the extent that defendant wishes to challenge the accuracy of Mr. Sadaka's opinion, it may do so on cross-examination at trial. Defendant's motion is denied with respect to this issue.

### 3. Damages Related to the Purported Corps-Caused Delay in Dredging MU-102

Finally, defendant contends that Mr. Sadaka does not appropriately address the harm suffered by plaintiff as a result of the Corps' alleged delay in allowing dredging in MU-102 because he "request[s] payment for costs that were required for the prosecution of the work . . . and, therefore, are not 'extended field costs' or . . . time-related costs." Mot. 9. Defendant also asserts that Mr. Sadaka's extended field costs include items for which plaintiff has already received payment. Id. at 10. Defendant further argues that Mr. Sadaka's methodology for calculating extended field costs "is either non-existent or makes no sense" because the methodology "is simply to total all costs incurred by [plaintiff] after January 1, 2001 and subtract a few costs without explaining why." Reply 3 n.2. Plaintiff, citing Mr. Sadaka's expert report and deposition, states that its "claim is that the delay caused by the Corps relating to MU-102 caused [it] to incur additional field costs that it otherwise would not have incurred," and that Mr. Sadaka "has given an opinion as to this amount, and the bases for his opinion, including the documents upon which he relied and the actual sums he used to calculate the final number." Resp. 14.

In his expert report, Mr. Sadaka explained that he calculated plaintiff's extended field costs by determining the total costs incurred between December 31, 2000, and April 15, 2001, and subtracting the amounts that were paid by the cubic yard. Def.'s Ex. 1 at 28. He provided a spreadsheet indicating each cost incurred and the date on which plaintiff incurred the cost. Def.'s Ex. 3. And, at deposition, Mr. Sadaka re-emphasized that the extended field costs were separate from the amounts for which the Corps paid plaintiff for the dredging actually performed and that

plaintiff would not have incurred the extended field costs but for the Corps-caused delays. Pl.'s Ex. B at 157-58.

Mr. Sadaka's extended field costs calculation is, as required by Federal Rule of Evidence 702, based on adequate facts, the product of reliable reasoning (i.e., identifying the direct costs incurred by plaintiff that plaintiff would not have incurred but for the alleged Corps-caused delays), and represents a reliable application of his reasoning to facts of the case.[4] In its November 28, 2007 Opinion and Order, the court limited the amount of extended field costs potentially recoverable by plaintiff to the costs incurred during the thirty-one days following the contract completion date of February 10, 2001. Mr. Sadaka has provided sufficient information to determine which of the itemized costs apply to this time period. Moreover, defendant retains the ability to confront Mr. Sadaka with plaintiff's putative duplicate requests for payment (ascertained by a straightforward comparison of plaintiff's pay estimates to the spreadsheet provided by Mr. Sadaka) during cross-examination at trial. Defendant's motion is denied on this issue.

### III. CONCLUSION

In sum, the court concludes that it can readily address defendant's objections to Mr. Sadaka's opinion testimony after hearing both the direct and cross-examination of Mr. Sadaka at trial and then weighing the parties' competing views. Thus, it **DENIES** defendant's motion in limine. The parties shall, **no later than Wednesday, September 30, 2009,** file a joint status report proposing a schedule for further proceedings. Plaintiff should consider incorporating time in the proposed schedule for Mr. Sadaka to prepare an amended expert report that conforms to the court's November 28, 2007 Opinion and Order, as plaintiff will not be permitted to present evidence at trial regarding damages in excess of those outlined in the decision.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[4] As with the calculations related to the NTP delay discussed above, the calculations at issue here are simple and do not necessitate an analysis under Daubert.